# 14-4133

---

## UNITED STATES COURT OF APPEALS

For the

## SECOND CIRCUIT

---

UNITED STATES OF AMERICA,

Appellee,

v.

Hao Chao, aka Sealed Defendant 2, aka Little Beijing,

Defendant

and

Xing Lin, aka Sealed Defendant 1, aka Ding Pa,

Defendant-Appellant

---

On Appeal from the United States District Court
for the Southern District of New York

---

## BRIEF AND SPECIAL APPENDIX FOR DEFENDANT-APPELLANT

Megan Wolfe Benett, Esq.
750 Third Avenue, 32nd Floor
New York, New York 10017
(212) 973-3406
mbenett@kreindler.com
*Attorney for Defendant Appellant Xing Lin*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT ....................................................... 1

STATEMENT OF THE ISSUES PRESENTED ...................................... 2

SUMMARY OF THE ARGUMENT ..................................................... 3

STATEMENT OF THE CASE ............................................................. 6

   I.  The Failed Plea Proceeding ........................................................ 6

   II.  The Trial ................................................................................ 9

         A. Trial Evidence About the Purported Enterprise ................ 10

         B. Testimony Concerning the "Gambling" Parlors ............... 13

         C. Testimony Concerning the Bus Operation ...................... 14

         D. July 29 – 30, 2004 .................................................... 16

         E. Dong Jai – "Cash" ..................................................... 18

         F. Witness Impeachment ................................................ 19

         G. Summations ............................................................. 22

         H. Jury Instructions, Verdict and Post-Trial Motions ........... 25

   III. The Sentencing ...................................................................... 30

ARGUMENT .................................................................................. 32

   I.  The Trial Court Abused it Discretion When Rejecting the Plea Based on the Incorrect Belief that Mr. Lin Had Not Admitted a Factual Basis for the Crime to Which He Attempted to Plead Guilty. ....................................... 32

   II.  The Conviction for Count Three (18 U.S.C. § 924(j)) Must be Vacated Because Hobbs Act Extortion is Not a Crime of Violence for Purposes of 18 U.S.C. § 924(c)(3) and Because the Aiding and Abetting Instruction was Improper ................................................................................ 36

         A. Hobbs Act Extortion is Not Categorically a Crime of Violence ...... 37

i

i.   The Hobbs Act Jury Instructions .............................................38

ii.  Hobbs Act Extortion is Not Divisible ......................................39

iii. Hobbs Act Extortion Does Not Categorically Qualify as a Crime of Violence Under the Force Clause ..........................................41

iv. Hobbs Act Extortion Does Not Categorically Qualify as a Crime of Violence Under the Risk-of-Force Clause............................44

v.  This Error Warrants Relief .......................................................46

B. The Court's Aiding and Abetting Instruction Was Erroneous .........47

III. Evidence of the Racketeering Acts Three, Four and Five Was Insufficient as a Matter of Law and the Convictions for Counts One and Two Must be Vacated.......................................................................................................50

IV. Mr. Lin Was Unduly Prejudiced by the Government's Improper Rebuttal Summation .................................................................................................58

V.  Multiple Errors Infected the Sentencing and Warrant Vacating the Sentence and Remanding for a New Sentencing Proceeding ........................................62

A. The Pre-Sentence Investigation Report and the Sentencing Proceeding...................................................................................................63

B. The District Court Committed Procedural Error in Failing to Conduct a Sentencing Guidelines Calculation, Failing to Engage in any 18 U.S.C. § 3553(a) Analysis and in its Bare Articulation About the Basis for the Imposed Sentence .........................................................66

C. The PSR Miscalculated the Sentencing Guidelines Range. .............68

D. The Sentence Was Substantively Unreasonable..............................74

CONCLUSION .................................................................................................75

CERTIFICATE OF COMPLIANCE ....................................................................77

## TABLE OF AUTHORITIES

**Cases**

*Begay v. United States*, 553 U.S. 137 (2008) ..........................................................40

*Descamps v. United States*, 133 S.Ct. 2276 (2013) ................................................39

*Dimaya v. Lynch*,  803 F.3d 1110 (9th Cir. 2015) ..................................................45

*Evans v. United States,* 504 U.S. 255 (1992)..........................................................42

*Gall v. United States,* 552 U.S. 38 (2007) ...................................................... 63, 66

*H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229 (1989) ...............................56

*Hedgpeth v. Pulido*, 555 U.S. 57 (2008) (*per curiam*) ...........................................48

*In re Winship*, 397 U.S. 358 (1970)........................................................................51

*Jackson v. Virginia*, 443 U.S. 307 (1979)...............................................................50

*Jamison v. United States*, 4 Fed. App'x 88 (2d Cir. 2001)....................................71

*Johnson v. United States*, 135 S.Ct. 2551 (2015) ............................................ 36, 45

*Johnson v. United States*, 559 U.S. 133 (2010) ......................................................40

*Koon v. United States*, 518 U.S. 81 (1996).............................................................32

*McCarthy v. United States*, 394 U.S. 459 (1969) ...................................................33

*Ocasio v. United States*, 136 S. Ct. 1423 (2016) ...................................................38

*People ex rel. Ellison v. Lavin*, 179 N.Y. 164 (1904)............................................54

*People v. Denson*, 192 Misc.2d 48 (Crim. Ct. N.Y. County 2002).........................54

*People v. Hunt*, 162 Misc.2d 70 (Crim. Ct. N.Y. County 1994) .............................54

*People v. Li Ai Hua*, 24 Misc.3d 1142 (Crim. Ct. Queens County 2009) ..............55

*People v. Mohammed*, 187 Misc.2d 729 (Crim. Ct. N.Y. County 2001) ................54

*People v. Turner*, 165 Misc.2d 222 (Crim. Ct. N.Y. County 1995.)......................54

*Prado v. United States*, 815 F.3d 93 (2d Cir. 2016) ................................... 37, 47, 49

*Rosemond v. United States*, 134 S. Ct. 1240 (2014)........................................ passim

*Santobello v. New York*, 404 U.S. 257 (1971) ........................................................32

*Shuti v. Lynch*,  --- F.3d --- , 2016 WL 3632539 (6th Cir. July 7, 2016) ...............45

*Taylor v. United States,* 495 U.S. 575 (1990).........................................................44

*United States v. Adams*, 448 F.3d 492 (2d Cir. 2006) ..................................... 32, 33

*United States v. Ahuja*, 936 F.2d 85 (2d Cir.1991).................................................74

*United States v. Aldeen*, 792 F.3d 247 (2d Cir. 2015), as amended

iii

(July 22, 2015) ...............................................................................74

*United States v. Bahel*, 662 F.3d 610 (2d Cir. 2011)..............................47

*United States v. Barker*, 723 F.3d 315 (2d Cir. 2013) ..........................40

*United States v. Bautista*, 23 F.3d 726 (2d Cir. 1994)...........................59

*United States v. Biaggi,* 909 F.2d 662 (2d Cir.1990), *cert. denied,* 499 U.S. 904 (1991) ...........................................................................................56

*United States v. Brecht*, 540 F.2d 45 (2d Cir. 1976), *cert. denied*, 429 U.S. 1123 (1977) ...........................................................................................43

*United States v. Carr*, 424 F.3d 213 (2d Cir. 2005) ..............................71

*United States v. Cavera,* 550 F.3d 180 (2d Cir.2008) (*en banc*) ..................... 62, 74

*United States v. Coppola*, 671 F.3d 229 (2d Cir. 2012) .................................. 46, 47

*United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013).............................67

*United States v. Cruz,* 797 F.2d 90 (2d Cir.1986) .................................60

*United Statses v. Dicristina*, 726 F.3d 92 (2d Cir. 2013.) .......................52

*United States v. Delano*, 55 F.3d 720 (2d Cir. 1995) .............................56

*United States v. Feldman*, 647 F.3d 450 (2d Cir. 2011).........................73

*United States v. Finley*, 245 F.3d 199 (2d Cir.2001).............................51

*United States v. Folkes*, 622 F.3d 152 (2d Cir. 2010) ...........................73

*United States v. Friedman*, 909 F.2d 705 (2d Cir. 1990) .......................59

*United States v. Gamez*, 577 F.3d 394 (2d Cir. 2009)............................ 36, 63

*United States v. Garcia*, 907 F.2d 380 (2d Cir. 1990)............................43

*United States v. Gigante*, 39 F.3d 42 (2d Cir. 1994), *vacated and superseded in part on denial of reh'g,* 94 F.3d 53 (2d Cir. 1996)........................... 43, 45

*United States v. Gomez*, 494 Fed. App'x 159 (2d Cir. 2012) ..................32

*United States v. Gonzalez-Longoria*, 813 F.3d 225 (5th Cir. 2016), *en banc rehearing granted*, 815 F.3d 189 (5th Cir. 2016) (mem.) ...................45

*United States v. Granados,* 142 F.3d 1016 (7th Cir. 1998).............................. 43, 46

*United States v. Hill*, --- Fed. App'x --- , 2016 WL 4129228 (2d Cir. Aug. 3, 2016)..................................................................... 38, 45

*United States v. Jie*, 17 Fed. App'x 28 (2d Cir. 2001) ...........................35

*United States v. Jones*, 393 F.3d 107 (2d Cir.2004).......................... 51, 63

*United States v. Juarez-Santamaria*, 513 Fed. App'x 306 (4th Cir. 2013) ............32

*United States v. Leung*, 40 F.3d 577 (2d Cir. 1994) ..............................68

*United States v. Lopez*, 615 Fed. App'x 24 (2d Cir. 2015).....................67

*United States v. Maher*, 108 F.3d 1513 (2d Cir. 1997) ..........................34

*United States v. Malki*, 609 F.3d 503 (2d Cir. 2010) ...............................................73

*United States v. Mancinas–Flores,* 588 F.3d 677 (9th Cir. 2009)...........................33

*United States v. Margiotta*, 688 F.2d 108 (2d Cir. 1982), *cert. denied*,
  461 U.S. 913 (1983)............................................................................................42

*United States v. Miller*, 116 F.3d 641 (2d Cir. 1997) ...............................................59

*United States v. Modica,* 663 F.2d 1173 (2d Cir.1981) *cert. denied,*
  456 U.S. 989 (1982)............................................................................................59

*United States v. Molina*, 356 F.3d 269 (2d Cir. 2004)...............................................66

*United States v. O'Connor*, 910 F.2d 1466 (7th Cir. 1990), *cert. denied*,
  498 U.S. 1082 (1991)..........................................................................................42

*United States v. Payne*, 591 F.3d 46 (2d Cir. 2010) .................................................66

*United States v. Pipola*, 83 F.3d 556 (2d Cir. 1996) .................................................34

*United States v. Rangolan*, 464 F.3d 321 (2d Cir. 2006)...........................................50

*United States v. Rashad*, 396 F.3d 398 (D.C. Cir. 2005)...........................................34

*United States v. Rattoballi*, 452 F.3d 127 (2d Cir. 2006) ..........................................74

*United States v. Rigas*, 583 F.3d 108 (2d Cir. 2009) .................................................74

*United States v. Rivera*, 192 F.3d 81 (2d Cir. 1999) .................................................32

*United States v. Rodriguez*, 392 F.3d 539 (2d Cir. 2004)...........................................50

*United States v. Sanchez*, 659 F.3d 1252 (9th Cir. 2011) ..................................... 61, 73

*United States v. Savage*, 542 F.3d 959 (2d Cir. 2008)...............................................67

*United States v. Severino*, 800 F.2d 42 (2d Cir. 1986) ..............................................34

*United States v. Smith*, 354 F.3d 171 (2d Cir. 2003) .................................................71

*United States v. Stephenson*, 895 F.2d 867 (2d Cir. 1990).........................................42

*United States v. Tellier*, 83 F.3d 578 (2d Cir. 1996) .................................................56

*United States v. Tomblin*, 46 F.3d 1369 (5th Cir. 1995)...................................... 43, 46

*United States v. Vivas-Ceja*, 808 F.3d 719 (7th Cir. 2015) .......................................45

*United States v. Walker*, 835 F.2d 983 (2d Cir. 1987)........................................ 59, 60

*United States v. Zhou*, 428 F.3d 361 (2d Cir. 2005) ........................................ passim

**Statutes**

18 U.S.C. § 16................................................................................................45

18 U.S.C. § 924......................................................................................... passim

18 U.S.C. § 1111................................................................................... 64, 70, 72

18 U.S.C. § 1951......................................................................................... passim

18 U.S.C. § 1955....................................................................................... 28, 52

18 U.S.C. § 1962 ...............................................................................25

18 U.S.C. § 3231 .................................................................................1

18 U.S.C. § 3553 .......................................................................... passim

18 U.S.C. § 3742 .................................................................................1

28 U.S.C. § 994 ................................................................................68

28 U.S.C. § 1291 .................................................................................1

New York Penal Law § 105.15 ..........................................................63

New York Penal Law § 125.25 ..........................................................63

New York Penal Law § 225.00 .............................................. 52, 53, 54

New York Penal Law § 225.05 ..........................................................52

## Other Authorities

United States Sentencing Guidelines § 1B1.1 ...................................66

United States Sentencing Guidelines § 2A1.1 ..................... 64, 69, 70, 71

United States Sentencing Guidelines § 2A1.2 ...................................69

United States Sentencing Guidelines § 2B3.2 .............................. 64, 72

United States Sentencing Guidelines § 2E1.1 .......................... 64, 65, 69

United States Sentencing Guidelines § 3B1.1 .......................... 64, 65, 66

United States Sentencing Guidelines § 3D1.4 ...................................31

United States Sentencing Guidelines § 5H1.10 ..................................68

United States Sentencing Guidelines Ch. 5, Pt. A, application note 2 ...............65

Glenn R. Schmitt & Hyun J. Konfrst, *Life Sentences in the Federal System, United States Sentencing Commission* (February 2015) ...................................75

## Rules

Federal Rule of Criminal Procedure 11 .............................................33

Federal Rule of Criminal Procedure 29 .............................................30

Federal Rule of Criminal Procedure 51 .............................................32

Federal Rule of Evidence 410 ...........................................................50

# JURISDICTIONAL STATEMENT

The District Court's jurisdiction was premised on 18 U.S.C. § 3231. This Court's jurisdiction is invoked under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). This appeal is from an Order of Judgment that the Honorable Miriam Goldman Cederbaum, United States District Judge, Southern District of New York, entered on October 29, 2014, following defendant-appellant Xing Lin's conviction after trial on four counts charged against him in Indictment S2 11 Cr. 114. A timely notice of appeal was timely filed on November 3, 2014. A. 22.[1]

---

[1] References to the Appendix are noted as "A." followed by the page number; references to the Special Appendix are noted as "SPA." followed by the page number; and references to the Confidential Appendix, containing materials subject to protective orders or sealing requirements, are noted as "CA." followed by the page number.

## STATEMENT OF THE ISSUES PRESENTED

I.     Whether the District Court erred in rejecting Mr. Lin's attempted guilty plea to aiding and abetting the discharge of a firearm in violation of 18 U.S.C. §§ 924(c) and 2.

II.    Whether the 18 U.S.C. § 924(j) conviction must be vacated because:

      a.    Hobbs Act extortion does not categorically qualify as a predicate crime of violence; and/or

      b.    The district court erred by failing to instruct the jury to determine whether Mr. Lin had sufficient advance knowledge of his confederate's possession of a firearm to establish aiding and abetting liability.

III.   Whether the absence of evidence that the activities Mr. Lin hosted constitute gambling under New York State law renders Racketeering Acts Three, Four and Five insufficiently proven and, if so, whether the racketeering convictions must be dismissed.

IV.    Whether the government's rebuttal summation deprived Mr. Lin of his right to a fair trial.

V.     Whether the sentencing was procedurally and/or substantively unreasonable.

## SUMMARY OF THE ARGUMENT

This brief is filed on behalf of defendant-appellant Xing Lin, who was convicted of four counts following a jury trial and subsequently sentenced to a term of life in prison without the possibility of parole. The charges alleged that Mr. Lin was the head of a criminal enterprise centered in Manhattan's Chinatown that operated gambling parlors and extorted payments from operators of bus companies, and that in connection with the extortion activities he aided and abetted a companion's use of a firearm that was used to shoot and kill two people.

Prior to trial, Mr. Lin had attempted to plead guilty to aiding and abetting the discharge of a firearm in furtherance of a crime of violence with a stipulation by the parties that the applicable sentence was 10 years in prison, which would have resolved the then-pending single-count indictment. The district court rejected the guilty plea, erroneously believing that the allocution had not satisfied the elements of the crime and that error must be remedied on appeal.

Mr. Lin then went to trial on a superseding indictment charging (1) conspiracy to commit racketeering; (2) racketeering; (3) murder through use of a firearm during and in relation to a crime of violence, namely, a Hobbs Act extortion; (4) Hobbs Act extortion; and (5) Hobbs Act extortion conspiracy. The government presented the jury with five predicate acts of racketeering: second-degree murder in violation of New York State penal law, a Hobbs Act extortion

3

and conspiracy (as one act) and three violations of the Illegal Gambling Businesses Act ("IGBA").

Mr. Lin was convicted of aiding and abetting the use of a firearm resulting in a death and in relation to a crime of violence (the Hobbs Act extortion.) A Hobbs Act extortion, however, cannot categorically qualify as a crime of violence and thus this conviction must be vacated and the charge dismissed. Alternatively, this conviction must be vacated because the district court erred in its aiding and abetting instruction, not requiring the jury to find that Mr. Lin had advance knowledge that his confederate would be carrying a weapon prior to the shooting incident.

To establish a criminal enterprise, the government solicited testimony from nearly a dozen witnesses about, among other things, Mr. Lin's card game and mahjong operations. The government also relied on that testimony to establish three of the five charged racketeering acts alleging violations of the IGBA. For Mr. Lin to have violated the IGBA, he would have had to have been hosting activities that violated New York State gambling laws. Under the New York State Penal Law, an activity constitutes gambling only if its outcome depends in material degree on chance. The government, however, introduced no evidence that the activities Mr. Lin hosted were contests of chance. The absence of any such evidence renders the jury findings on the IGBA racketeering acts unsustainable and

4

leaves the bare minimum of two pattern acts to support the racketeering and racketeering conspiracy convictions. Given the heavy reliance the government placed on the IGBA violations in establishing the racketeering counts, and in light of how thin the racketeering evidence was in the absence of the IGBA violations, the convictions for those two counts must be vacated.

Finally, the life sentence was procedurally and substantively unreasonable. At sentencing, the district court conducted no Sentencing Guidelines or statutory sentencing analysis. Instead, the court simply noted in passing the seriousness of the case and then sentenced Mr. Lin to three life sentences and a concurrent 20-year term of imprisonment. In doing so, the district court utterly failed to satisfy its sentencing obligations and the sentences must be vacated and the case remanded for resentencing.

Accordingly, Mr. Lin's convictions for Counts One, Two and Three should be vacated, Count Three of the indictment should be dismissed, and a new trial ordered as to the remaining counts. In the alternative, the sentence should be vacated and the case remanded for resentencing.

## STATEMENT OF THE CASE

In 2011, the federal government indicted Defendant-Appellant Xing Lin with one count of violating 18 U.S.C. §§ 924(j) and 2. The indictment charged Mr. Lin with aiding and abetting the discharge of a firearm, thereby causing two deaths on July 30, 2004, in relation to a Hobbs Act extortion. A. 23 – 24.

### I. The Failed Plea Proceeding

On June 27, 2012, Mr. Lin appeared in court to plead guilty to aiding and abetting the discharge of a firearm in furtherance of a conspiracy to commit extortion in violation of 18 U.S.C. §§ 924(c) and 2. A. 31 – 32. Prior to the plea proceedings, the parties had stipulated in an agreement that the applicable Sentencing Guidelines sentence was 120 months. A. 27. At the plea hearing, the judge reminded Mr. Lin that he would be entering a plea to "aiding and abetting the discharge of a firearm in furtherance of a conspiracy to commit extortion." A. 38. Defense counsel explained that with the assistance of an interpreter he had prepared a written allocution with Mr. Lin. A. 56. The trial court would not let Mr. Lin read from his prepared statement, explaining that "I try to avoid reading." A. 56.

During the ensuing colloquy, it was established that Mr. Lin went to a karaoke club the night of July 30, 2004 with a companion who was functioning as his bodyguard (known as Little Beijing) and whom Mr. Lin knew at the time to be

6

carrying a gun. A. 57, 73.  When they went to the karaoke bar, Mr. Lin saw

"Zhou," who operated a bus line that competed with a bus company in which Mr.

Lin and two other people had a financial interest. A. 59, 67, 70 – 71.  Mr. Lin

admitted that he wanted "to take over" Zhou's "competing bus company." A. 61 –

62.  Getting rid of Zhou's business would have conferred a benefit on Mr. Lin and

his partners because with Zhou's competition "we have to make the … ticket price

cheaper." A. 72.  Mr. Lin had therefore been trying to either take over Zhou's bus

business or get Zhou to pay him not to take it over. A. 67, 71.  In connection with

those efforts, Mr. Lin had previously told Zhou that if he did not give Mr. Lin

money, Mr. Lin would do him harm. A. 67 – 68.

On the night that they went to the karaoke bar, Mr. Lin very much "wanted

to get this man out of [his] way" and told his armed bodyguard to "[g]o there,

make a threat to him." A. 74.  Mr. Lin wanted the bodyguard to follow his orders,

expected his bodyguard to use physical force on Zhou and knew that the

bodyguard had a gun. A. 66, 73 – 74.  Mr. Lin explained that he had told his armed

bodyguard that Mr. Zhou "was a nasty guy.  Just teach him a lesson." A. 84.

Having described or admitted to the above facts, Mr. Lin's allocution had

established that he: (1) was seeking to enrich the bus company he owned with two

others by threatening Zhou into relinquishing a competing commercial enterprise;

(2) told his bodyguard to threaten Zhou in connection with his effort to enrich the

bus company by using physical force; and (3) knew his bodyguard was carrying a firearm when directed to threaten Mr. Lin's competition.

Despite this, during the proceeding the trial court expressed dissatisfaction with the fact that Mr. Lin had not admitted to "possess[ing] or us[ing] the weapon." A. 76. The prosecution explained that because Mr. Lin "knew that Little Beijing possessed a gun … [t]he defendant was therefore constructively possessing the gun himself" and that Mr. Lin had admitted to instructing his bodyguard "to teach [Zhou] a lesson, to beat him or curse him or threaten him." A. 76. After allowing the government to make an offer of proof, the district court decided that it "would really like to hear another allocution." A. 77 – 82, 84. Defense counsel explained that he believed a further proceeding was unnecessary because Mr. Lin had "trie[d] to answer your Honor's questions" and thus the allocution was sufficient. A. 84. Nevertheless, the judge believed it needed "to be clear – if he never told [his bodyguard] before to beat anybody, that is a little weird – that saying teach him a lesson means that he should beat him." A. 86.

When the parties appeared the next day, Mr. Lin's attorney advised the court that the defense was no longer prepared to proceed with a guilty plea at that time. A. 92 – 94. The government noted that it was "of the view that the [previous day's] allocution was more than sufficient to satisfy the crimes charged." A. 97.

At a subsequent appearance on July 12, 2012, the trial court explained that "[w]ithout any intention that the body guard shoot it is very hard to establish aiding and abetting." A. 102. The district court also noted "something else that is a real deficiency in the allocution which is that it is alleged that this is done in relation to a conspiracy for extortion. I didn't hear any testimony about an agreement of any kind with anybody. You can't have a conspiracy with a single actor." A. 102. The government explained that Little Beijing was a co-conspirator and acted at Mr. Lin's direction and in furtherance of the efforts to extort Zhou. A. 103. (Mr. Lin's allocution had also earlier established that he and two others had a joint financial interest in getting Zhou to give up his bus line.) Nevertheless, the district court refused to accept Mr. Lin's effort to plead guilty. A. 103.

By the time of trial, the government had filed a superseding indictment alleging a racketeering conspiracy (Count One), racketeering (Count Two), use of a firearm in furtherance of a crime of violence which firearm caused a death (Count Three), extortion (Count Four) and a conspiracy to commit extortion (Count Five). A. 115 – 131.

## II. The Trial

The government's theory at trial was that Mr. Lin was the leader of a racketeering enterprise it called the "Ding Pa organization" (after Mr. Lin's nickname). The government sought to prove a pattern of racketeering through

9

specific acts, including the operation of what it described as several illegal gambling parlors as well as extortionate efforts used to obtained a portion of the profits of a bus company that transported people between Manhattan's Chinatown and North Carolina.[2]  According to the government, in order to protect his businesses, his status and his portion of the bus profits, Mr. Lin was involved in an incident at a karaoke club in Queens on July 30, 2004 in which Mr. Lin's bodyguard fired a gun and killed two people.

At trial, the government called 16 witnesses, ten of whom knew Mr. Lin and testified to their personal and business relationships with him and six of whom were law enforcement officers and medical responders.  The ten witnesses with personal knowledge of Mr. Lin all were in the country illegally, most had lied under oath previously and nearly all had been brought to the government by a non-witness, Dong Jai, also known as "Cash," who operated another bus company.

### A. Trial Evidence About the Purported Enterprise

Several witnesses testified that within the Chinatown culture, a "dailo" is a person who has "followers" who will do what the leader directs them to do. A. 489 -90, 602, 637.

---

[2] Though during the plea allocution, the parties and court referred to South Carolina, at trial the testimony concerned bus routes between New York City and North Carolina.

10

For example, Huo Guang Chen, who knew Mr. Lin through mutual friends, believed that Mr. Lin was a dailo because people would do things that he told them to do. A. 485 – 89.  Qun Li testified that he had been a follower (also known as a "kid") for a dailo and that he had known Mr. Lin to be a dailo. A. 538 – 39.  Q. Li[3] had also at one point briefly become a dailo, with four or five followers of his own. A. 539.  Cai Xiang Li testified that he believed Mr. Lin had "followers" who would "watch over" things for him and who would go out and about in Chinatown with him. A. 602.  Cheng Yong testified that he believed Mr. Lin was a dailo because "[h]e took care of everything," by which C. Yong meant "[t]he fights and others.  He would be the one to step forward to do the talking." A. 637.

Shun Qing Chen testified that a dailo has "kid or followers that follow him and someone with a ranking" and said that he was a "follower" of Mr. Lin around 2001 to 2003. A. 579.  As such, S.Q. Chen said he would go with Mr. Lin "to look for people to participate in fights." A. 579.  S.Q. Chen said that Mr. Lin had other "followers" and when asked about "any structure or order to the followers," he explained just that "[t]hose people hung out with [Mr. Lin]" prior to when he did. A. 580.  As a follower, S.Q. Chen was made a shareholder with Mr. Lin in an operation at 21 Eldridge Street where people played a card game known as 13 cards. A. 579.

---

[3] Because several witnesses shared names, they are referred to throughout by their first initials as well as last name.

11

Several of the enterprise witnesses testified about occasions when they had seen Mr. Lin involved in physical disputes. C.X. Li testified that on one occasion (more than ten years before the trial) he witnessed Mr. Lin and his followers go into a gambling parlor behind a barbershop on East Broadway, dragging out a person named Yi Qiu and, along with Mr. Lin, assaulting that person. A. 602 – 03. H.G. Chen testified that on July 16, 2000, he saw Mr. Lin at a gambling parlor located at 21 Orchard Street. A. 491. According to H.G. Chen, Mr. Lin took a gun and pointed it to the head of the owner of the gambling parlor, complaining that the owner had failed to give Mr. Lin "face," which H.G. Chen understood to be an acknowledgement of Mr. Lin's power. A. 492. After demanding "face in the future," Mr. Lin was said to fire a shot at the ground and leave 21 Orchard Street. A. 492. H.G. Chen also said that Mr. Lin had a dispute in June or July 2002 about gambling parlors with another dailo called Yi Feng. A. 505. According to H.G. Chen, Mr. Lin fired a gun at Yi Feng's gambling parlor and subsequently was stabbed by one of Yi Feng's followers, after which Mr. Lin moved to Atlanta. A. 505.[4] (Though S.Q. Chen testified that he was with Mr. Lin for the incident at Yi Feng's business, he did not see Mr. Lin with a gun that night. A. 581 – 82.) Q. Li testified that sometime around 2000 he saw Mr. Lin enter a room at a karaoke bar with two people, telling one of them to "beat him up for me," but Q. Li did not say

---

[4] C.X. Li also testified to seeing Mr. Lin get beaten at or around that time, alongside of S.Q. Chen. (696.)

that any fight ensued. A. 540. That same year, Q. Li and Mr. Lin ran into each other at a restaurant in Brooklyn and got into a fight after Q. Li insulted Mr. Lin. A. 541. Sometime thereafter, Q. Li and Mr. Lin got into another fight in a barbershop on Eldridge Street during which Q. Li stabbed Mr. Lin with a screwdriver. A. 542, 552. Song Di Xiang testified that he and Mr. Lin got into a verbal dispute that escalated into a physical fight with other people accompanying Mr. Lin at a restaurant on Division Street in Manhattan. A. 564.

### B. Testimony Concerning the "Gambling" Parlors

Several witnesses testified that Mr. Lin was involved in the operation of games conducted at various locations in Chinatown.

Guang Yun Zhu, who also went by "Yi Pei," testified that he knew Mr. Lin to have owned an operation in which individuals played the Chinese card game known as tien lin, or 13 cards, at a location on Eldridge Street. A. 300 – 01. G.Y. Zhu testified that he along with 20 to 30 others, including Mr. Lin, were shareholders in this operation. A. 300. According to G.Y. Zhu, this operation was extant for two to three months, during which time as many as 20 to 30 people might be playing the card game. A. 301. H.G. Chen also testified about Mr. Lin's tien lin card game operation on Eldridge Street, which had about five to six people working there. A. 486 – 87, 637. S.Q. Chen and C. Yong testified that there were sometimes 20 to 30 people at 21 Eldridge playing the card game. A. 580, 637.

13

C.X. Li testified about two locations on the first and second floors of a building on Madison Street in Manhattan where other games were hosted. A. 599 – 600. C.X. Li would occasionally fill in at mahjong games on the second floor if the group was short of the necessary four players and also would serve tea and alcoholic beverages to people engaged in the game. A. 600. According to C.X. Li, Mr. Lin rented the location, collected money from players and took a commission. A. 600. On the first floor at Madison Street, C. X. Li said that people would play tien lin. A. 600. At that spot, as many as 20 to 30 people would play the game. A. 601. C.X. Li said that Mr. Lin also collected money from those playing 13 cards. A. 601. He testified that there were about 20 shareholders in the 13 cards parlor at Madison Street. A. 601.

None of the witnesses provided a description of how mahjong or tien lin were played.

### C. Testimony Concerning the Bus Operation

H.G. Chen testified that he, along with other shareholders, owned a bus company. A. 478. The business began with H.G. Chen and another partner named Chen Jia Chuan in November 2001 and drove restaurant workers between New York and North Carolina. A. 494. About six months after starting their business, the partners learned that a rival bus company was going to begin operating on the same route, so C.J. Chuan went to Mr. Lin in the hope that Mr. Lin "would be able

14

to convince the boss of the other company not to come in." A. 496.[5]  The partners
did so because Mr. Lin "had a good relationship" with the putative competitor,
with the two being "good friends." A. 526.  In exchange, the partners would give
Mr. Lin a one-third share in their bus business. A. 497.  The partners had decided
that it was in their better economic interest "to have Mr. Lin be a part of the
company than to risk losing it." A. 533.  The potential rival company thereafter did
not run any buses on the contested route. A. 497.

H.G. Chen testified that around June or July 2003, Mr. Lin said he wanted
an additional ten percent of the bus company and told H.G. Chen that to keep a
part of the business he had to cooperate with the request. A. 506.  H.G. Chen,
unhappy with that prospect, went to Chang Qin Zhou, also known as Yi Qun, a
friend of Yi Feng (the man who had previously orchestrated a stabbing that led to
Mr. Lin leaving the New York City area.) A. 506.  H.G. Chen thought Yi Qun had
"very good relationships with people in Chinatown, also with people at the
gambling parlors," and believed he could help the situation. A. 507.  H.G. Chen
testified that soon after he had gone to Yi Qun, Mr. Lin asked H.G. Chen to join
him in Corona Park to talk. A. 507.  While there, Mr. Lin purportedly complained
that H.G. Chen "did not give [Mr. Lin] face … and his followers had guns with
themselves every day," though H.G. Chen never saw them with a gun. A. 507.

---

[5] C.J. Chuan did not testify at trial.

15

Thereafter, the two bus company partners decided to pay Mr. Lin an additional $2,000 per month, which Mr. Lin accepted. A. 507. At the same time, the two partners sold ten percent of the bus company shares to Yi Qun. A. 507.

About a year later, in June 2004, Yi Qun learned of the additional $2,000 monthly payments to Mr. Lin. A. 510. When Yi Qun discovered the payments, he directed the partners to stop paying Mr. Lin. A. 510. H.G. Chen ceased making that extra payment to Mr. Lin for one month, but resumed after the July 30, 2004 shooting incident described below. A. 511. After Mr. Lin left the New York City area to live full-time in Atlanta (and soon after the July 30, 2004 shooting), he told H.G. Chen that "if there [was] anything just give" his followers in New York "a call." A. 511. H.G. Chen continued to make payments of one-third of the profits of the bus operation, first to Mr. Lin then via Mr. Lin's wife's bank account, until November 2009. A. 512.

### D. July 29 – 30, 2004

G.Y. Zhu testified that on July 29, 2004, after dining in Manhattan with several other people, he and his companions ended up at the Heaven on Earth karaoke bar in Flushing, Queens. A. 303. Yi Qun, who had directed that the $2,000 monthly bus payments to Mr. Lin stop, was among the group. A. 305, 417, 419. The men got a private room and then paid to have two female hostesses join them. A. 306 – 07. C.X. Li was also there and testified that he saw Mr. Lin and

16

another man as they walked down a public corridor at the bar. A. 607.  C.X. Li was in the hallway when he saw the two men enter the private room where Yi Qun, G.Y. Zhu and others were socializing. A. 608.

According to G.Y. Zhu, while the karaoke music was playing and the men were drinking, Mr. Lin and a companion (Little Beijing) entered the private room. A. 308.  G.Y. Zhu testified that as soon as he entered the room, Mr. Lin spoke only to say to Little Beijing "shoot" in Foochow, the regional language of Fujian province in southern China, after which several shots were fired at Yi Qun. A. 308 – 09; 432.[6]  Cheng Yong likewise testified that he was in the private room when Mr. Lin and another man entered; Yi Qun "threw away the … microphone," tossing it onto the floor, "and then he open up his arms," at which point Mr. Lin said "shoot" in Foochow and the other man "opened fire." A. 640, 645.[7]  After hearing what he believed to be shots and seeing flashes from inside the private room, C. X. Li saw Mr. Lin and his companion running out of the karaoke establishment. A. 608.  Yi Qun and one of the two hostesses serving the group, Mei Ying Li, were both shot and died as a result of their injuries. A. 391, 372.

---

[6] According to H.G. Chen, Mr. Lin later told him that "the northerner" – Little Beijing, who would have spoken Mandarin – misunderstood Mr. Lin in the bar. A. 511.

[7] NYPD detective Salvatore LaCova testified as a ballistics expert and stated that five shell casings recovered from the Heaven on Earth karaoke club on July 30, 2004 were all fired from the same weapon. A. 624.

The parties stipulated that Mr. Lin's car was parked near Heaven on Earth the day after the shooting and that call detail records from a telephone with an account registered to Heng De Oh Yeng, who drove a care for hire, would show an incoming call on the day after the shooting. A. 625; 629 – 30.  Heng De Oh Yeng testified that while he received a call on July 30, 2004 from Mr. Lin asking for a ride from Flushing, Queens, he did not see Mr. Lin that day, let alone give Mr. Lin a ride anywhere. A. 630.

No testimony or other evidence was introduced to establish that Mr. Lin knew that Little Beijing was carrying a weapon when the two went to the Heaven on Earth karaoke bar.

### E.  Dong Jai – "Cash"

Dong Jai (also spelled Dan Jian), or "Cash," was in many ways the fulcrum of the government's case.  He was known as a dailo with "face" in Chinatown who commanded respect from the community. A. 515.  He had a reputation with "almost everyone in Chinatown" as being an informant for the government. A. 516, 643.  "[A] lot of people in Chinatown" knew Cash. A. 570, 629.  Every witness to the relevant criminal conduct had some relationship with Cash and all but one witness's testimony was procured to some extent by Cash.

G.Y. Zhu's sister once dated Cash. A. 347, 453, 571.  At the time of trial, Cash was H.G. Chen's "boss." A. 503 – 04, 515.  Cash first arranged for H.G.

18

Chen to meet with the government and coordinated to get H.G. Chen to meetings with federal agents during the course of the investigation and as the prosecution prepared for trial. A. 504, 516.  In the middle of the trial, H.G. Chen called Cash and asked to meet with him in person. A. 532.  H.G. Chen, Cash and G.Y. Zhu had lunch at a restaurant on East Broadway during the early days of the trial. A. 504, 532.  Cheng Yong testified that Cash had arranged for him to meet with the government and have him act as a confidential informant "[s]o that deportation would be postponed." A. 636, 641 – 42.  Cash had located C.X. Li for the government and had brought him to meet with federal agents. A. 613.  Allen Chen was Cash's cousin and came to the United States from Canada to testify against Mr. Lin at Cash's behest. A. 574 – 75.  S.Q. Chen began to meet with the government in connection with the investigation through the efforts of his "friend" Cash. A. 578 – 79.  But the government never called Cash as a witness.[8]

### F.  Witness Impeachment

The enterprise testimony came from a band of guileful witnesses, nearly all of whom had previously lied under oath and most of whom were testifying under the cloud of significant criminal histories.

---

[8] Cash's star has fallen and he is now the top-named defendant in a prosecution pending in federal court in Brooklyn, in which he is alleged to have run a criminal enterprise that was engaged in extortion, illegal gambling, assault and narcotics crimes. *See* 15-cr-628, E.D.N.Y.  A trial in that case is scheduled to begin on Nov. 7, 2016.

G.Y. Zhu paid a smuggler (or, in the vernacular of the witnesses, a "snakehead") $40,000 to get him to the United States. A. 334. He thereafter asked for political asylum, claiming he had been involved in the Tiananmen Square democracy movement, which was a lie. A. 342 – 44. Despite his asylum application being denied and despite being ordered to leave the United States, G.Y. Zhu remained in New York illegally. A. 343 – 44, 413.

Applying for asylum after arriving in the United States illegally, H.G. Chen wholesale adopted the story he had heard someone else tell about converting to Christianity following a car accident in China and then claiming religious persecution in support of an asylum application, when none of that was true. A. 478 – 81. In the course of his testimony, H.G. Chen tried to claim that he had a legitimate basis for asylum because of purported political persecution, but that he simply opted to include the false religious story instead. A. 523. H.G. Chen had two asylum applications denied and was ordered removed from the United States, but remained in the country illegally. A. 520. Though at one point he was detained in anticipation of removal proceedings arising out of the 2002 removal order that he had been evading, H.G. Chen was able to get released with the help of an officer with the Immigration and Customs Enforcement agency. A. 481, 524 – 25.

C.X. Li was likewise in the United States illegally at the time of trial. A. 611. He, like the other witnesses, had lied in an asylum application. A. 612. He

was ordered removed in 1997, was given the opportunity to depart the country voluntarily but instead remained in the United States illegally for nearly two decades. A. 616 – 17.

Q. Li had entered the United States illegally using a false passport arranged by a professional smuggler. A. 536. He, too, filed multiple asylum applications replete with lies about purported pro-democracy activities and religious persecution. A. 536 – 37. He used his brother's identity and falsely claimed to be an indigent refugee in order to obtain a lawyer at no cost in connection with his second asylum application, made when he was in Canada. A. 544 – 45. Q. Li received government subsidies as a result of his fake refugee status. A. 545. In addition to committing burglaries and drug distribution for which he had not been prosecuted, Q. Li had been twice convicted of federal felonies, once for extorting bus operators and once for bail jumping. A. 536 – 38. Though he had been held in custody by immigration officials, Federal Bureau of Investigation agents arranged for him to be released and helped him obtain legal status to work in the United States. A. 538. In exchange, Q. Li had to "help [the FBI] with whatever they ask [him] to do for them." A. 538.

C. Yong had been smuggled into the United States and had submitted an asylum application in which he lied about being subject to political persecution in China, which was ultimately denied, resulting in a deportation order that he

evaded. A. 642 – 44. S.Q. Chen and Heng De Oh Yeng were both in the United States without any legal status and had both been previously convicted in federal court of committing extortion. A. 576 – 77, 621, 634. At the time that he was involved in extortion, S.Q. Chen was supposed to be cooperating with federal law enforcement agents, whom he had offered to assist prior to engaging in his misconduct and to whom he had (falsely) promised he would not commit a crime. A. 583. S.Q. Chen had also lied during the course of a presentence investigation report interview with an officer from the United States Department of Probation, claiming never to have taken controlled substances despite a long history of using marijuana, ketamine and ecstasy. A. 598 – 99.

Not only did witnesses lie in previous proceedings, at least one made misleading statements under oath at trial. While on the witness stand, G.Y. Zhu initially denied having lunch on his first day of testifying with Cash and H.G. Chen, who was scheduled to testify later for the government, before finally acknowledging that he had eaten with them. A. 402 – 04.

### G. Summations

During summations, the government went through each of the categories of its proof: the card and mahjong parlors, the pattern of violence, the bus line extortion and the events of July 29 – 30, 2004. A. 666 – 73. Laying the foundation of the enterprise and its criminal purpose, the government started with the

gambling activities, describing the money spent at each location, the shareholders in the parlors, the numbers of players involved and Mr. Lin's role with the businesses. A. 667.  Immediately after setting out its argument as to the enterprise's involvement with illegal gambling, the prosecution turned to the "pattern of violence committed by the defendant … to maintain the defendant's reputation." A. 667.  The government then discussed the efforts Mr. Lin made to obtain a portion of the bus company profits, which the prosecution argued amounted to extortion. A. 668 – 69.  Last, the government recited the testimony about the events of July 29 – 30, 2004 and the shooting incident. A. 669 – 71.  It was "gambling, extortion, murder" that constituted racketeering and a "pattern of criminal activity" according to the government. A. 671.  Last, the prosecutor argued that the jury should believe the witnesses because they were reluctantly testifying, unhappy to be called to trial, and corroborated each other, especially with respect to the gambling operations. A. 672.

Mr. Lin's counsel argued primarily that the government witnesses – almost all of whom had been recruited by and presented to investigators by Cash – could not be believed. A. 673 – 81.  Defense counsel pointed out the many lies witnesses had made previously while under oath, the self-interest they had in pleasing the government and the inconsistencies in their trial testimony and their

prior statements. He also at one point reminded the jury that while the government

could have called Cash to testify, it had chosen not to do so. A. 677.

In its rebuttal argument, the government began by expressing indignation at

"[t]he audacity of this defense" and arguing that "[t]here are many things wrong

with this defense, so many things wrong with it, that I'm not entirely sure where to

start. But we have to start somewhere. So let's take a hard look at this alternate

universe." A. 682. As to witness credibility, the prosecution asked "[i]s [the]

defense really saying that in the wake of this horrific murder, that these three

people came together and decided to frame Xing Lin" at the behest of Cash? A.

683. Then, addressing defense counsel's argument about Cash's absence at trial,

the prosecutor argued

> the suggestion that we're somehow putting one over on all of you by
> not bringing Cash in to testify, it needs to be addressed, at least
> briefly. He doesn't have a burden to do anything. He does not need
> to bring anybody in to testify … . It's our burden of proof. And we
> don't shy from it. It's our burden. He doesn't need to do anything.
> **That said, he knows where Cash is.**

A. 683 (emphasis added.) The prosecutor next suggested that defense counsel was

accusing the government of framing Mr. Lin, arguing to the jury that

> … Mr. Cohen is a nice guy; he doesn't want to openly accuse the
> people in the front table [the prosecutors and agents] of fabricating
> this case. … **But isn't he really saying that the [prosecutors and
> agents were] a part of this**. … That we're relying … on … lying
> witnesses. .. What do we have against Mr. Lin? Why is he so
> important to us? **What do the agents and prosecutors in this case
> have to motivate them to suborn perjury? … To risk their**

24

**careers?** … Ladies and gentlemen, if there was a conspiracy to get the defendant, why weren't the witnesses' stories better? … [The witnesses] testified as to what they remember. They testified truthfully.

A. 683 – 84 (emphasis added).

Defense counsel repeatedly objected during the rebuttal and moved for a mistrial. A. 689 – 90. The district court sustained only two of the objections then chastised defense counsel in front of the jury for interrupting the government's rebuttal and offered no curative instructions. A. 690. The court ultimately denied the mistrial motion.

### H. Jury Instructions, Verdict and Post-Trial Motions

Instructing the jury, the district court started with Counts Four and Five (the 18 U.S.C. § 1951 Hobbs Act extortion and conspiracy, respectively) because those were predicate acts to the crimes charged in Counts One (racketeering conspiracy under 18 U.S.C. § 1962(d)), Two (racketeering under 18 U.S.C. § 1962(c)) and Three (use of a firearm in relation to a crime of violence causing a death in violation of 18 U.S.C. § 924(j)). A. 691 – 92.

As to Count Four, the district court instructed the jury on the four elements of a Hobbs Act extortion that the government had to prove: (1) that the defendant obtained money or property from another with that person's consent; (2) that the defendant induced the consent by "the wrongful use or threat of force, violence or fear"; (3) an effect on interstate commerce; and (4) that the defendant acted

25

knowingly and willfully. A. 692.  Speaking to the third element, the court

explained that the jury would have to

> determine whether the defendant obtained the money or property through the **wrongful use of actual or threatened force, violence, or fear of** physical injury **or economic harm**.  …   **It is not necessary that the government prove that force, violence, and fear were all threatened or used.  The government satisfies its burden if it proves beyond a reasonable doubt that any of these methods were threatened or used. … The force or violence might be aimed … at causing economic rather than physical harm**.  In determining whether the defendant used fear to obtain money or property, **you must determine whether a victim experienced anxiety, concern, or worry over expected personal harm or economic loss**. … Fear need not be a consequence of an implicit or explicit threat. The wrongful use of fear requires that the defendant create or instill fear, or use or exploit existing fear with the specific purpose of inducing another to part with property.

A. 692 – 93 (emphasis added).  As to Count Five, the Hobbs Act extortion

conspiracy, the district court instructed the jury that conspiring to commit

extortion was a separate crime from extortion itself, and proceeded to explain

that a Hobbs Act conspiracy required proof of an agreement to accomplish

the Hobbs Act extortion, as previously described to the jury. A. 693.

Turning to the racketeering charges, the district court started with Count

Two, explaining that the government had to prove that a group of individuals

"associated together in order to make money and achieve other objectives through

a pattern of racketeering." A. 695.  If the enterprise was established, the jury would

have to determined if the enterprise activities had some affect on interstate

commerce (the second element); if Mr. Lin was associated with that enterprise (the

third element); and if Mr. Lin had engaged in a pattern of racketeering activity (the

fourth element.) A. 696.  As to the fourth element (pattern), the judge explained

that the government had to establish that Mr. Lin had engaged in at least two

racketeering acts within 10 years of each other and that the two acts were

sufficiently related to the enterprise as to constitute a pattern and, if there was a

pattern of racketeering activity in which Mr. Lin had engaged, that there was a

"meaningful connection" between those acts and the purported enterprise. A. 696.

The jury was instructed as to five specific acts of racketeering they were to

consider for purposes of establishing a pattern.

    Racketeering Act One charged Mr. Lin with murdering and conspiring

to murder change Chan Qin Zhou (Yi Qun) on or about July 30th, 2004 in

violation of New York State Penal Law § 125.25. A. 697.  Racketeering Act

Two charged Mr. Lin with extortion and conspiracy to commit extortion of

the owners of a bus company from about March 2002 to December 2009 in

violation of 18 U.S.C. § 1951. A. 697.  Racketeering Acts Three, Four and

Five charged Mr. Lin with operating a mahjong parlor in or about 1996, a

tien lin (or 13 card) parlor from 1996 until 1997 and a tien lin (13 card)

parlor from 1999 to 2002, respectively, all in violation of the Illegal

Gambling Businesses Act,18 U.S.C. § 1955. A. 697 – 98.  The district court

27

explained that under 18 U.S.C. § 1955, the jury had to find that the government established three elements beyond a reasonable doubt, the first of which was that "the gambling business … violated New York State law." A. 697. The district court went on to explain that with respect to that first element, illegal gambling under New York State law, occurs when a person stakes something of value on the outcome of a game of a contest of change (or future contingent event) not under that person's control. A. 697. Quoting the New York State penal law, the district court explained that "'A contest of chance is any game in which the outcome depends in a material degree on chance.'" A. 697.

Turning to Count Two (racketeering conspiracy), the court explained that it differed from Count One (racketeering) insofar as it could be established by proof of an agreement to create an enterprise and two predicate racketeering acts either having been committed or having intended to be committed as part of the conspiracy. A. 699. The district court then reminded the jury of the five predicate racketeering acts that it had described in connection with Count Two. A. 699 – 700.

Finally, with respect to Count Three, the firearm charge, the district court instructed the jury on two theories: (1) with Mr. Lin acting as a principal and, alternatively, (2) with Mr. Lin as aider and abettor. A. 701 -02. The district court set forth the four elements of Count Three: (1) that Mr. Lin committed a crime of

violence (which the jury was told could be either the extortion or the extortion conspiracy in Counts Four and Five); (2) that Mr. Lin used or aided and abetted the use of the firearm during and in relation to one of those predicate acts of extortion; (3) that this conduct was a "substantial factor" in the deaths of Chang Qin Zhou or Mei Ying Li; and (4) that the deaths constituted murder, meaning that they were committed with "malice aforethought." A. 701 – 02.[9]  Addressing "aiding and abetting the use of a firearm," the district court explained that the jury could "find the defendant guilty of Count Three" if there was proof beyond a reasonable doubt that Mr. Lin "willfully and knowingly associate[d] himself in some way with the crime, and that he willfully and knowingly [sought] by some act to help make the crime succeed." A. 702.  Specifically,

> To determine whether the defendant aided or abetted the commission of Count Three, ask yourself these questions: One. Did the defendant participate in the crime charged as something he wished to bring about? Two. Did the defendant associate himself with the criminal venture knowingly and willfully? Three. Did the defendant seek by his actions to make the criminal venture succeed? If the answers to each of these questions is yes, then the defendant is an aider and abettor.

A. 702.

---

[9] During the charge conference the parties addressed the meaning of "malice aforethought," with the government successfully arguing to remove language of "premeditation" as the two phrases were not coterminous and the prosecution only had to establish second degree murder, which did not require premeditation. A. 659 – 60, 713 – 18.

After a day of deliberations, the jury returned a verdict of guilty on Counts One through Four, while acquitting Mr. Lin of Count Five (conspiracy to commit extortion) and found all racketeering acts except for the extortion conspiracy proven. A. 719, 721 – 22.[10]  Trial counsel made a timely motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, which the district court denied. A. 755.

### III.    The Sentencing

In advance of Mr. Lin's sentencing, the Probation Department prepared a Presentence Investigation Report ("PSR.") CA. 1 -33.  In the PSR, the Probation Department grouped certain counts and racketeering acts.  Group One combined the Count One racketeering conspiracy conviction and the two acts relating to the death of Zhou (Racketeering Act One and the 18 U.S.C. § 924(j) conviction in Count Three), applying the first-degree murder guideline in USSG § 2A1.1, resulting in a base offense level of 43 and then adding four points for Mr. Lin's status as an organizer or leader for a total offense level of 47. CA. 15.  Group Two combined the extortion conviction from Count Four, the racketeering conspiracy in Count One and Racketeering Act Two (extortion), calculating the base offense level as 43 because of the extortion-related death of Zhou and adding four leadership points for a total offense level of 47. CA. 16.  Group Three concerned

---

[10] Only the blank verdict sheet submitted to the jury was included in the district court's record, and thus only the blank form is included in the appendix.

30

the predicate gambling racketeering acts, and the PSR calculated a base offense level of 19 with four leadership points, resulting in a total offense level for group three of 23. CA. 16. Applying the multiple-count adjustment in USSG § 3D1.4, the PSR calculated a final offense level of 49, which it reduced to 43 pursuant to the Sentencing Guidelines application note concerning the "rare instances where the total offense level is calculated in excess of 43." CA. 17. At any criminal history category, an offense level of 43 corresponded to a recommended sentence of life in prison. Defense counsel did not object to any portion of the PSR. CA. 27.

In the defense sentencing submission Mr. Lin's trial counsel focused primarily on witness credibility. A. 734 – 40. At sentencing, after hearing from Mr. Lin and his attorney, the district court went immediately to imposing sentence, engaging neither in an analysis under the Sentencing Guidelines nor any evident consideration of the various sentencing factors mandated by 18 U.S.C. § 3553(a). A. 754 – 56. The district court did not indicate if it was accepting the factual findings or the Sentencing Guidelines as calculated in the PSR. The only explanation of the sentence was the following statement by the court:

> This was a very serious and heavy case, and it is no pleasure to have to sentence a young man to life in prison, but on Counts One, Two, and Three, I do now sentence you, Mr. Lin, to life in prison. There is no question, based on the evidence in this case, that you are responsible for the death of another human being. Now on Count Four, I set a sentence of 20 years, to run concurrently with the sentence on Counts One, Two, and Three.

31

A. 756. The district court spent more time discussing the fine ultimately imposed

– $25,000 – than it did the sentence itself, which imprisoned a man not yet forty

years old to spend the rest of his life in prison. A. 756 – 59.

## ARGUMENT

I. **The Trial Court Abused it Discretion When Rejecting the Plea Based on the Incorrect Belief that Mr. Lin Had Not Admitted a Factual Basis for the Crime to Which He Attempted to Plead Guilty.**

While a defendant does not have an absolute right to have a guilty plea

accepted and the district courts are afforded significant discretion in accepting or

rejecting guilty pleas, when rejection of a plea rests on "an error of law," that, "by

definition" constitutes an abuse of discretion. *United States v. Gomez*, 494 Fed.

App'x 159 (2d Cir. 2012), quoting *Koon v. United States*, 518 U.S. 81, 100 (1996);

*see also Santobello v. New York*, 404 U.S. 257, 262 (1971.) So, too, will a

rejection of a plea grounded on a clearly erroneous finding of fact warrant relief.

*United States v. Adams*, 448 F.3d 492, 499 (2d Cir. 2006) (district court committed

reversible error in accepting plea without an adequate factual basis of defendant's

guilt.)[11]

---

[11] Defense counsel noted at several points during the proceedings that the allocution was sufficient – as did the government. This claim is therefore preserved for appellate review. *See* Fed.R.Crim.P. 51; *United States v. Rivera*, 192 F.3d 81, 84 (2d Cir. 1999) (defendant adequately preserved argument on sentencing departure by alerting district court to his claim, even if not in the language used on appeal); *see also United States v. Juarez-Santamaria*, 513 Fed. App'x 306, 309 (4th Cir. 2013) (defendant, "after asking the court to accept his plea," was not "required to

A defendant may, as a general matter, plead guilty, with a guilty plea being "an admission of all the elements of a formal criminal charge." *McCarthy v. United States*, 394 U.S. 459, 466 (1969). The Federal Rules of Criminal Procedure impose a number of requirements on a district court taking a guilty plea, one of which is that the court "determine that there is a factual basis for the plea." Fed.R.Crim.P. 11(b)(3). The factual-basis requirement is meant to ensure that a defendant does not plead guilty based on a misunderstanding of his or her conduct in relation to the elements of the crime charged. *See McCarthy*, 394 U.S. at 466 – 67.[12] "Only if defendant had denied committing a specific element of the offense or protested his innocence even after demonstrating that he understood the charge would the court have … discretion to reject his plea for lack of a factual basis." *Mancinas-Flores*, 588 F.3d at 685.

Under Fed.R.Crim.P. 11 a court does not need to "be satisfied that a jury would return a verdict of guilty. Nor does it require the court to weigh evidence to

---

object when the court refused to accept it"); *United States v. Mancinas–Flores,* 588 F.3d 677, 686 (9th Cir. 2009) (when a "defendant ask[s] the court to accept his plea and argue[s] in favor of it," he does "not have to ask the court to reconsider its decision or point out possible errors in the decision" to preserve claim.) Further, several months after the parties both argued that Mr. Lin's allocution was sufficient, the district court reminded the government that "I rejected the plea, if you recall." A. 199.

[12] While Rule 11 has been revised since *McCarthy*, the decision's "rationale remains viable for substantiating the requirement of a sufficient factual basis for a plea." *Adams*, 448 F.3d at 500 n.3.

assess whether it is even more likely than not that the defendant is guilty." *United States v. Maher*, 108 F.3d 1513, 1524 (2d Cir. 1997). The rule only requires only that the court assure itself that the conduct to which the defendant admits is in fact an offense under the terms of the statute to which he is pleading guilty. *United States v. Severino*, 800 F.2d 42, 45 (2d Cir. 1986).

In *Severino*, this Court concluded that a trial court may reject a plea if it believes that the defendant has not been truthful when there exists no evidence other than the defendant's statements "to which the court could look for verification."*Id* at 47. When, however, a trial court rejects a plea not because the defendant lacked credibility, but because the court wrongly believed it did not have the discretion to accept the plea, that mistake is error "as a matter of law." *United States v. Rashad*, 396 F.3d 398, 403 (D.C. Cir. 2005) (trial court's mistaken belief that defendant was not eligible to plead guilty warranted relief.)

At the time of the attempted plea here, liability for aiding and abetting a violation of 18 U.S.C. § 924(c)(3)(iii) required proof only that a defendant intentionally participated in the crime charged, associated knowingly and willfully with the venture and sought by his or her actions to make the criminal venture succeed, including with the use of the firearm. *See United States v. Pipola*, 83 F.3d 556, 565 (2d Cir. 1996) (aiding and abetting proved where defendant "designed the plans for two robberies and these plans, including the use of firearms, were

34

effectuated through the acts of his co-conspirators"); *see also United States v. Jie*, 17 Fed. App'x 28 (2d Cir. 2001) (trial court did not err in accepting plea to aiding and abetting § 924(c) violation when defendant admitted knowing his co-conspirators were bearing firearms when initiating a kidnapping and did not deny his role in its arrangement.) [13] Thus, all that Mr. Lin had to credibly acknowledge – all of which he admitted to during the plea allocution – was that he knowingly participated in a venture with Little Beijing to use force in the course of the efforts to extort Zhou, knowing at the time that Little Beijing was armed and knowing that Little Beijing would follow his orders.

The district court's rejection of Mr. Lin's guilty plea was grounded in the legally erroneous belief that Mr. Lin had to have personally possessed or used the weapon and that it was insufficient that he merely directed Little Beijing (knowing Little Beijing was armed) to use force against Zhou in connection with the efforts to get Zhou to give up (or pay to continue) operating the bus line. This Court should thus find that the district court abused its discretion in rejecting the plea, vacate Mr. Lin's conviction and remand the case with instructions to permit Mr. Lin to plead guilty to the information that the government previously offered as part of the plea agreement.

---

[13] As discussed *infra*, subsequent to the plea proceeding, the Supreme Court's decision in *Rosemond v. United States*, 134 S. Ct. 1240 (2014), altered the landscape of aiding and abetting liability on the firearm charge.

**II.  The Conviction for Count Three (18 U.S.C. § 924(j)) Must be Vacated Because Hobbs Act Extortion is Not a Crime of Violence for Purposes of 18 U.S.C. § 924(c)(3) and Because the Aiding and Abetting Instruction was Improper**

Count Three, convicting Mr. Lin of aiding and abetting the use of a firearm in relation to a crime of violence that causes the death of a person in violation of 18 U.S.C. §§ 924(j) and 2, must be vacated for two reasons.  First, extortion is not categorically a "crime of violence" for purposes of 18 U.S.C. § 924(j).  Second, the jury instruction on aiding and abetting was directly contrary to the Supreme Court's decision in *Rosemond v. United States*, 134 S.Ct. 1240, 1251 – 52 (2014), which held that aiding and abetting requires foreknowledge that a gun will be used in the course of the predicate crime.

Because Mr. Lin did not raise these arguments before the district court, the plain error standard of review applies. Fed.R.Crim.P. 52(b).  Ordinarily, under the plain error standard, Mr. Lin must establish there was (1) an error; (2) that was plain; (3) that affected his substantial rights; and (4) that seriously affected the fairness, integrity or public reputation of judicial proceedings. *United States v. Gamez*, 577 F.3d 394, 397 (2d Cir. 2009) (per curiam).  Because, however, the Supreme Court issued a decision altering settled law between the time of trial and the time of appeal on both of the Count Three arguments, the modified plain error standard should apply here.  Not until well after trial did the Supreme Court issue its decision in *Johnson v. United States*, 135 S.Ct. 2551 (2015) ("*Johnson* (2015)"),

36

which was the final chapter in a series of cases directly relevant to the analysis of how a "crime of violence" can be established for purposes of the 18 U.S.C. § 924(j) count. Likewise, the Supreme Court's 2014 decision in *Rosemond* invalidating jury instructions largely identical to the ones given in this case was issued following trial. Given the intervening changes in the law, under the modified plain error analysis "the burden of persuasion as to prejudice (or, more precisely, lack of prejudice) is borne by the government, and not the defendant." *Prado v. United States*, 815 F.3d 93, 102 (2d Cir. 2016).

### A. Hobbs Act Extortion is Not Categorically a Crime of Violence

Count Three charged Mr. Lin with violating 18 U.S.C. § 924(j). That statute provides enhanced sentencing consequences for "A person who, in the course of a violation of subsection (c), causes the death of a person through the use of a firearm." Section 924(c)(1)(A), provides that:

> [A]ny person who, during and in relation to a **crime of violence** … uses or carries a firearm, or who in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence [face enhanced punishment.]

(emphasis added.) Under 18 U.S.C. § 924(c)(3), a "crime of violence" is defined as a felony that:

> (A)    has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(B)   that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

The statute therefore has two means by which a predicate act can constitute a crime of violence: (A) under the "force clause" if it involves the use, attempted use or threatened use of force; or (B) under the "risk-of-force" clause if by its nature it involves a substantial risk of physical force.[14]

The predicate crime of violence for Count Three were violations of the Hobbs Act, which has two subsections defining two sets of acts: robbery and extortion. 18 U.S.C. § 1951(b).  Mr. Lin was charged only with extortion, which the statute defines as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2); *see also Ocasio v. United States*, 136 S. Ct. 1423, 1435 (2016) ("As used in the Hobbs Act, the phrase 'with his consent' is designed to distinguish extortion … from robbery  … .")

### i.   The Hobbs Act Jury Instructions

When charging the jury on Count Three, the district court explained that to find Mr. Lin guilty the government had to establish that, among other things, Mr.

---

[14] This Court recently addressed a similar issue in connection with a Hobbs Act robbery and noted that 18 U.S.C. § 924(c)(3)(B), which some had called the "residual clause" was more accurately termed the "risk-of-force" clause. *United States v. Hill*, --- Fed. App'x --- , 2016 WL 4129228 (2d Cir. Aug. 3, 2016.)

Lin had committed the Hobbs Act extortion charged in Count Four.[15]  The trial court instructed the jury that Hobbs Act extortion had four elements, the critical one with respect to Count Three being that a defendant induced another's consent to part with property through the actual or threatened use "of force, violence, **or** fear." A. 692 (emphasis added).  The district court further explained that the threat could be aimed at "causing economic rather than physical harm."  A. 692 – 93.  The Hobbs Act jury instruction thus makes clear that the 18 U.S.C. § 924(j) predicate "crime of violence" could be accomplished by mere fear of future economic harm.[16]

### ii.  Hobbs Act Extortion is Not Divisible

If a statute criminalizes different categories of offense conduct, it is considered "divisible"; when, on the other hand, the law sets forth a single crime, though accomplishable by several different methods, it is not divisible. *See Descamps v. United States*, 133 S.Ct. 2276, 2285 (2013).

The predicate act here was the Hobbs Act extortion.  The statute sets forth different elements for robbery and extortion, thus making it divisible as to those two categories of criminal conduct.  The statute does not, however, create separate

---

[15] The jury acquitted Mr. Lin of the Hobbs Act extortion conspiracy, so for purposes of the appeal the only relevant predicate act for Count Three is the Hobbs Act extortion in Count Four.

[16] The court also told the jury "that extortion … [is a] crime[] of violence for purposes of Count Three." A. 701.

extortion sub-crimes. *See United States v. Barker*, 723 F.3d 315, 320 (2d Cir. 2013) (in unlawful sex act with a minor case, finding the statute at issue was not divisible as it did not "list potential offense elements in the alternative"). That is, Hobbs Act extortion under 18 U.S.C. § 1951(b)(2) sets forth a single set of elements: (1) obtaining of property from another with that person's consent; (2) consent "induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right"; and (3) an effect on interstate commerce. To the extent it contains different methods of inducing consent to deprive another person of property, those methods do not alter the elements of the crime. Thus, a Hobbs Act extortion is not divisible.

To determine whether an offense can satisfy the 18 U.S.C. §924(c) crime of violence element, a court must determine whether the offense in all of its incarnations, including "the least of [the] acts" that would fall within its purview, will categorically constitute a crime of violence. *Johnson v. United States*, 559 U.S. 133, 137 (2010). In doing so, a court assesses whether a crime qualifies as a violent felony "in terms of how the law defines the offense and not in terms of how an individual offender might have committed it on a particular occasion." *Begay v. United States*, 553 U.S. 137, 141 (2008). Here, the determination of whether a Hobbs Act extortion qualifies as a crime of violence must consider whether the least of the acts encompassed by 18 U.S.C. § 1951(b)(2) – in this case, inducing

40

another to relinquish property "under color of official right" – will categorically qualify as a crime of violence under 18 U.S.C. § 924(c)(3).

Even, however, if a Hobbs Act extortion is divisible between "color of right" extortion and "wrongful use of actual or threatened force, violence, or fear" extortion, the least of the acts that would establish extortion by use of force/violence/fear would not qualify as a crime of violence. Thus, no Hobbs Act extortion charge – whether or not the statute is divisible – can serve as a predicate offense for 18 U.S.C. § 924(c)(3) purposes.

### iii. Hobbs Act Extortion Does Not Categorically Qualify as a Crime of Violence Under the Force Clause

For a predicate crime to qualify as a crime of violence under the 18 U.S.C. § 924(c)(3)(A) "force clause" it must have "as an element the use, attempted use, or threatened use of physical force against the person or property of another." Should this Court determine that the Hobbs Act extortion provision is indivisible, it must determine if all conduct falling within the purview of consent induced through color of official right necessarily has as an element the use, attempted use or threatened use of force. If this Court determines that Hobbs Act extortion is divisible between color-of-right and force/violence/fear, it must still consider whether the least culpable conduct falling within the force/violence/fear sub-section necessarily involves the use, attempted use or threatened use of force.

41

"At common law, extortion was an offense committed by a public official who took 'by color of his office' money that was not due to him for the performance of his official duties. . . . Extortion by the public official was the rough equivalent of what we would now describe as 'taking a bribe.'" *Evans v. United States*, 504 U.S. 255 (1992). Under the Hobbs Act "the coercive element is provided by the public office itself," without any further proof of inducement required. *Id.* at 266; *see also United States v. Margiotta*, 688 F.2d 108, 130 (2d Cir. 1982), *cert. denied*, 461 U.S. 913 (1983) ("[t]he public officer's misuse of his office supplies the necessary element of coercion . . . ."). Accordingly, multiple color-of-right convictions have been affirmed in the absence of any use, attempted use or threatened use of force. *See United States v. O'Connor*, 910 F.2d 1466 (7th Cir. 1990), *cert. denied*, 498 U.S. 1082 (1991) (police officer accepts payments from FBI agents posing as crooked auto parts dealers); *United States v. Stephenson*, 895 F.2d 867 (2d Cir. 1990) (international trade official in Department of Commerce accepts payments to influence ruling). Because a Hobbs Act extortion can be accomplished by mere misuse of public office, and does not require the use or threatened use of physical force, it cannot qualify categorically as a crime of violence.

Even if considering a Hobbs Act extortion as divisible, force/violence/fear extortion also categorically fails to qualify as a crime of violence under the force

42

clause, as the least culpable conduct falling within its purview does not necessarily have as an element "the use, attempted use, or threatened use of physical force against the person or property of another" as required by 18 U.S.C. § 924(c)(3)(A).

As this Court has previously explained, "Over the years, our cases have concluded that the fear required in extortion cases 'can be satisfied by putting the victim in fear of economic loss.'" *United States v. Garcia*, 907 F.2d 380, 381 (2d Cir. 1990) (quoting *United States v. Brecht*, 540 F.2d 45, 52 (2d Cir. 1976), *cert. denied,* 429 U.S. 1123 (1977). Thus, this Circuit has held that "economic pressure aimed at" eliminating "competitive bidding" establishes a Hobbs Act extortion. *United States v. Gigante*, 39 F.3d 42, 46 (2d Cir. 1994), *vacated and superseded in part on denial of reh'g,* 94 F.3d 53 (2d Cir. 1996). Similarly, the Seventh Circuit has held that an offer to cease publishing derogatory articles in exchange for monetary payment constitutes a Hobbs Act extortion as it "prey[ed] on [the victim's] fear of economic harm." *United States v. Granados,* 142 F.3d 1016, 1020 (7th Cir. 1998); *see also United States v. Tomblin*, 46 F.3d 1369, 1385 (5th Cir. 1995) (affirming Hobbs Act extortion conviction based on victims' fear that they would lose a financial investment.) The district court's jury instructions in this case are consistent with those cases, explaining that the Hobbs Act crime could be accomplished without threatened, attempted or actual physical force but by mere fear, worry or concern over potential economic harm. A. 692 – 93.

43

Because a Hobbs Act extortion under a force/violence/fear theory does not require the use, attempted use or threatened use of force for a conviction in the statute's least culpable incarnation, which here would be threats aimed at causing concern of an economic loss, it is not categorically a crime of violence under the force clause, and cannot serve as an 18 U.S.C. § 924(j) predicate.

### iv. Hobbs Act Extortion Does Not Categorically Qualify as a Crime of Violence Under the Risk-of-Force Clause

A Hobbs Act extortion – whether divisible or not – is also not categorically a crime of violence under the risk-of force clause in 18 U.S.C. § 924(c)(3)(B). That provision defines a crime of violence as an offense that "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." In previous analysis of similar language in the residual clause of the Armed Career Criminal Act ("ACCA"), the Supreme Court directed courts to use the categorical approach when deciding whether an offense "involves conduct that presents a serious potential risk of physical injury to another." *Taylor v. United States,* 495 U.S. 575, 600 (1990). As discussed above, the categorical approach considers only the statutory definition of the offense, and not the facts involved in any individual case. Deciding whether the risk-of-force clause "covers a crime thus requires a court to picture the kind of conduct that the crime involves in 'the ordinary case,' and to judge whether that

abstraction presents a serious potential risk of physical injury." *Johnson (2015)*, 135 S. Ct. at 2557. [17]

A Hobbs Act extortion ordinarily can be – and frequently has been – accomplished without conduct presenting a substantial risk of physical force potentially being used. As discussed above, the color-of- right Hobbs Act extortion is accomplished by misuse of public office and thus presents no risk, let alone a substantial one, of the use of force. Even if Hobbs Act extortion is divisible, a threat/fear/violence Hobbs Act extortion can likewise ordinarily be accomplished through mere fear of potential economic loss, which does not present a substantial risk that physical force will be used. Indeed, economic pressure – not fear of the risk of force – has frequently been sufficient for satisfying the threat/fear/violence element of a Hobbs Act extortion. *See Gigante*, 39 F.3d at 46

---

[17] This Court has declined to extend the Supreme Court's reasoning in *Johnson (2015)* that language in the ACCA's residual clause was unconstitutionally vague to 18 U.S.C. § 924(c)(3)(B). *Hill*, 2016 WL 4129228. The *Hill* decision is at odds with decisions in four other circuits regarding language in 18 U.S.C. § 16(b) that is identical to the language in 18 U.S.C. § 924(c)(3). *See Shuti v. Lynch*, --- F.3d --- , 2016 WL 3632539 (6th Cir. July 7, 2016); *United States v. Gonzalez-Longoria*, 813 F.3d 225, 227 (5th Cir. 2016), *en banc rehearing granted*, 815 F.3d 189 (5th Cir. 2016) (mem.); *United States v. Vivas-Ceja*, 808 F.3d 719, 723 (7th Cir. 2015); *Dimaya v. Lynch*, 803 F.3d 1110 (9th Cir. 2015) Given that the Supreme Court has not yet ruled on a vagueness challenge to 18 U.S.C. § 924(c)(3)(B) and given the split among circuits as to the constitutionality of the language that appears in Section 924(c)(3)(B), Mr. Lin also hereby asserts that the risk-of-force clause is unconstitutionally vague, sharing the same ambiguities present in the now-invalidated residual clause of the Armed Career Criminal Act.

("economic pressure" designed to eliminate competitive bidding sufficient for establishing a Hobbs Act extortion); *Granados,* 142 F.3d at 1020 (fear of economic harm from derogatory articles satisfies Hobbs Act extortion fear element); *Tomblin*, 46 F.3d at 1385 (fear of losing financial investment satisfies Hobbs Act extortion fear element); *see also United States v. Coppola*, 671 F.3d 229, 241 – 42 (2d Cir. 2012) (Hobbs Act fear can be established by fear of "economic destruction.")

The "ordinary case" of a Hobbs Act extortion thus clearly includes conduct in which another person is placed only in fear of economic loss, without a "substantial risk" of "physical force" being used against the person or property of another, as required under the 18 U.S.C. § 924(c)(3)(B) risk-of-force clause.   This is confirmed by the jury instructions here, in which the district court explained that the threat/fear/violence element could be satisfied by a defendant causing "fear" resulting in making another person experience "anxiety, concern, or worry" over potential "economic loss." (1036.)  A Hobbs Act extortion therefore categorically fails to qualify as a crime of violence under 18 U.S.C. § 924(c)(3)(B)'s risk-of-force clause.

### v.  This Error Warrants Relief

Relying on a Hobbs Act extortion as a predicate crime of violence was error that was plain, as the minimum conduct necessary to commit a Hobbs Act extortion would not necessarily qualify as a "crime of violence" under either the

force clause or the risk-of-force clause. The error substantially affected Mr. Lin's rights insofar as the unsupported conviction for Count Three resulted in a life sentence. It likewise seriously affects the fairness, integrity or public reputation of judicial proceedings as it allowed a conviction to rest on a clearly inadequate predicate act for the conviction on Count Three. Thus, Count Three, convicting Mr. Lin of violating 18 U.S.C. § 924(j), must be vacated and dismissed.

## B. The Court's Aiding and Abetting Instruction Was Erroneous

This Court reviews challenges to jury instructions *de novo* and will reverse "where the charge, viewed as a whole, demonstrates prejudicial error." *Coppola*, 671 F.3d at 247. "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *United States v. Bahel*, 662 F.3d 610, 634 (2d Cir. 2011). When a defendant failed to object to the instruction, the challenge on appeal is reviewed under the plain error standard. *Prado*, 815 F.3d at 100.

In *Rosemond*, the Supreme Court addressed the requirements for a conviction of aiding and abetting the use of a firearm in violation of 18 U.S.C. § 924(c) in a case involving a drug trade as the predicate crime. The trial court had instructed the jury that it could convict the defendant if "(1) the defendant knew his cohort used a firearm in the drug trafficking crime, and (2) the defendant knowingly and actively participated in the drug trafficking crime." 134 S.Ct. 1244.

47

The court imposed no requirement that the jury find that the defendant intended the gun be used or even that he was aware of the firearm prior to the drug crime. The Supreme Court held this was error, ruling that aiding and abetting liability on an 18 U.S.C. § 924(c) count requires that a defendant have advance knowledge that a gun would be used in the predicate crime and that a jury be instructed accordingly. *Id.* at 1251 – 52.[18]

In this case, the trial court charged the jury that it could convict Mr. Lin of Count Three as either a principal actor or as an aider and abettor. A. 702. After providing a blanket aiding and abetting liability instruction, the district court told the jury that it must ask itself three questions:

> One. Did the defendant participate in the crime charged as something he wished to bring about? Two. Did the defendant associate himself with the criminal venture knowingly and willfully? Three. Did the defendant seek by his actions to make the criminal venture succeed?

A. 702.

This instruction incorrectly failed to instruct the jury that it had to find that Mr. Lin had "advance knowledge" of Little Beijing's firearm prior to when "it appear[ed] on the scene." *Rosemond*, 134 S.Ct. at 1249. The jury instructions in

---

[18] The verdict sheet reflects this option, not requiring the jury to note under what theory they considered Count Three. A. 722. "[A] conviction based on a general verdict is subject to challenge if the jury was instructed on alternative theories of guilt and may have relied on an invalid one." *Hedgpeth v. Pulido*, 555 U.S. 57, 58 (2008) (*per curiam*).

this case largely mirror similar instructions that this Court recently (in light of *Rosemond*) found improper in *Prado*, 815 F.3d at 98. Here, as in *Prado*, the court issued a "blanket aiding and abetting instruction requiring intent to commit the crime" but doing so did "not cure the failure to require the jury to find that defendant[] had advance knowledge of the firearm." *Id.* at 102. The aiding and abetting jury instruction here, as in *Prado*, was thus clearly erroneous *Id.*

As in *Prado*, the erroneous jury instruction affected Mr. Lin's substantial rights, as it allowed the jury to return a verdict of guilty without the requisite finding of advance knowledge. *Id.* Similarly, the error here seriously affected the fairness, integrity, or public reputation of the proceedings. *Id.* at 103. Had the jury been properly instructed that it was required to find that Mr. Lin joined in the criminal venture with advance knowledge of the gun, there is a reasonable probability that he would have been acquitted of Count Three.[19] *Id.* at 103. All of the witness testimony about the shooting, of course, was that Little Beijing, not Mr. Lin, fired the weapon, and no witness testified that prior to being in the private karaoke room did Mr. Lin know or should he have known that Little Beijing was

---

[19] This prong of the analysis is not the same as a sufficiency challenge. Even if the record contains sufficient proof to sustain the conviction, the same record can also, simultaneously, support the conclusion that the outcome might have been different had the jury been properly instructed. *See id.* at 104 fn 3.

armed.[20]  Only two of the government witnesses were in the private room at the time of the shooting: G.Y. Zhu and C. Yong.  The two were inconsistent about the sequence of events preceding the shooting, with only C. Yong claiming that Yi Qun first dropped the microphone and held out his arms.  Evidence of Mr. Lin's knowledge that Little Beijing was armed before they entered the private karaoke room is non-existent and even evidence that Mr. Lin knew once they were in the room that Little Beijing had a weapon would be premised on the inconsistent testimony of two witnesses who had been established to have previously lied while under oath.  Under these circumstances, there is a reasonable probability of a different outcome had the jury been properly instructed and the conviction for Count Three must be vacated.

## III.  Evidence of the Racketeering Acts Three, Four and Five Was Insufficient as a Matter of Law and the Convictions for Counts One and Two Must be Vacated.

A challenge to the sufficiency of the evidence is reviewed *de novo* on appeal. *United States v. Rangolan*, 464 F.3d 321, 324 (2d Cir. 2006).  In reviewing for insufficiency, a court need consider "only 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" *United States v. Rodriguez*, 392 F.3d 539, 544 (2d Cir. 2004) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318 (1979)).  The trial evidence is considered in the light most favorable

---

[20] Mr. Lin's admissions during the rejected plea proceeding cannot be considered as proof on this Count. FRE 410.

to the prosecution, crediting "every inference that the jury may have drawn" in the governments favor. *United States v. Finley*, 245 F.3d 199, 202 (2d Cir.2001) (internal quotation and quotation marks omitted.)  A conviction will thus be upheld so long as any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*.  But while Mr. Lin's burden on a sufficiency challenge is heavy, it is "not an impossible one." *United States v. Jones*, 393 F.3d 107, 111 (2d Cir.2004).[21]  Indeed, the courts "are bound by the fundamental principle that 'the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" *United States v. Zhou*, 428 F.3d 361, 375 (2d Cir. 2005) (reversing for lack of evidence on element of extortion conviction) (quoting *In re Winship*, 397 U.S. 358, 364 (1970).)  Thus, when the trial record contains no evidence of an element of the crime, insufficiency is established as a matter of law. *Zhou*, 428 F.3d at 377.

Counts One and Two charged Mr. Lin with a racketeering conspiracy and racketeering, respectively.  As to Count Two, the jury was instructed on five

---

[21] Mr. Lin's trial counsel made a Rule 29 motion, though addressing Counts Four and Five. A. 665.  To the extent that it is not construed to encompass the sufficiency challenge here, Mr. Lin should still prevail on plain error review, as the wholesale absence of evidence on an element of the crime is error that is clear, it affected his substantial rights (by contributing to the convictions on Counts One and Two despite the absence of evidence on an element of the predicate acts) and it seriously affected the fairness, integrity or public reputation of judicial proceedings (allowing for a conviction despite the absence of any supporting evidence).

predicate acts: murder in violation of state law (Act One); extortion and extortion

conspiracy (presented as a single predicate act, Act Two); operation of a mahjong

parlor in 1996 in violation of the federal Illegal Gambling Businesses Act (IGBA),

which, in turn, relied on a violation of New York State penal laws (Act Three);

operation of a tien lin parlor from 1996 – 1997 (again, in violation of the IGBA

and, thus, state law) (Act Four); and operation of a tien lin parlor from 1999 – 2002

(also in violation of the IGBA and state law) (Act Five).

The IGBA criminalizes operation of an "illegal gambling business. An

illegal gambling business is defined as one which, among other things, "is a

violation of the law of a State or political subdivision in which it is conducted."

18 U.S.C. § 1955(i).[22] With respect to Racketeering Acts Three, Four and Five, the

district court instructed the jury that it had to find proven beyond a reasonable

doubt that the gambling business charge violated New York State law," then cited

to New York State Penal Law §§ 225.00 ("gambling offenses") and 225.05

---

[22] The IGBA also provides a non-exhaustive list of the types of activities that would constitute "gambling," which does not include mahjong or tien len. 18 U.S.C. § 1955(b)(4). This Circuit has previously held that the IGBA does not require a determination that the business was dominated by chance so long as the underlying activity is a violation of state gambling law. *United Statses v. Dicristina*, 726 F.3d 92 (2d Cir. 2013.) In *Dicristina*, the defendant had not challenged that the activity (poker) was a game of chance under state law, but argued that a conviction under the IGBA required an additional determination that poker constituted gambling under the federal statute, which this Court rejected. *Id.* Unlike in *Dicristina*, here, Mr. Lin argues that the proof was insufficient to establish that the activities constituted gambling under state law.

("promoting gambling.") A. 697. An element of the crime of gambling (or

promotion of gambling) under New York law, is that the activity was a "contest of

chance" which the district court explained "is any game in which the outcome

depends in a material degree on chance." A. 697. The jury ultimately found that

Racketeering Acts Three, Four and Five were all proven.

The jury's findings on the violation of state law element of Acts Three, Four

and Five, however, were unsupported by any record evidence concerning whether

the outcome of a game of mahjong or tien lin depends in a material degree on

chance. Not a single witness testified how either game was played, so the jury had

no information upon which to premise a finding that the activities depended in any

degree, let alone a "material degree," on chance. As the district court noted during

the charge conference, "The one thing I didn't learn from this trial is how to play

13 cards." 927. Agreeing, the prosecutor said "I know. I'm still trying to learn. I

can look it up on the Internet." A. 664.

Nor can either activity be considered gambling as a matter of law in the

absence of any testimony about the games. The term "contest of chance" in New

York Penal Law § 225.00 has proved problematic for courts and commentators.

"While some games or schemes are obviously 'contests of chance' (*e.g.*, roulette) ...

and some are obviously contests of skill (*e.g.*, chess), there is a vast middle ground

or gray area (*e.g.*, bridge and some other card games) that had caused the courts

considerable difficulty."  William C. Donnino, Practice Commentary, McKinney's

Cons Laws of N.Y., N.Y. Penal Law § 225.00 (2015).  As the New York State

Court of Appeals explained over a century ago:

> Throwing dice is purely a game of chance, and chess is purely a game
> of skill. But games of cards do not cease to be games of chance
> because they call for the exercise of skill by the players, nor do games
> of billiards cease to be games of skill because at times, especially in
> the case of tyros, their result is determined by ... 'luck'. The test of the
> character of the game is not whether it contains an element of chance
> or an element of skill, but which is the dominating element that
> determines the result of the game?

*People ex rel. Ellison v. Lavin*, 179 N.Y. 164, 170-71 (1904).  While under the

current definition of "contest of chance," the penal law does not require that the

element of chance be the "dominating element," courts have still struggled to

determine whether the outcome of a game depends to a "material degree" on

chance.  For example, trial courts have debated whether "three-card monte" or

similar "shell games" are contests of chance and thus gambling. *See People v.

Mohammed*, 187 Misc.2d 729 (Crim. Ct. N.Y. County 2001); *People v. Hunt*, 162

Misc.2d 70 (Crim. Ct. N.Y. County 1994); *but see People v. Denson*, 192 Misc.2d

48, 50 – 52 (Crim. Ct. N.Y. County 2002); *People v. Turner*, 165 Misc.2d 222

(Crim. Ct. N.Y. County 1995.)

   With respect to mahjong, at least one New York State court has concluded

that without factual description of how the game is played, it cannot be considered

a contest of chance for purposes of New York law. *People v. Li Ai Hua*, 24

Misc.3d 1142 (Crim. Ct. Queens County 2009) (dismissing as facially insufficient an accusatory instrument alleging mahjong is a contest of chance).  As noted above, some card games (such as bridge) fall somewhere between chance and skill, so the mere fact that the game of tien lin involved cards cannot alone qualify it as a game of chance.

Given that authorities have held that mahjong is not a game of chance for purposes of the New York State gambling laws and that card games are not, merely by virtue of involving card play, games of chance, and given the absence of any testimony at all as to how either mahjong or tien lin is played, the jury had no information upon which to premise a finding that the activities were games of chance, thus leaving an element of the IGBA predicate acts wholly unsupported.  Predicate Acts Three, Four and Five must therefore be vacated.

This, in turn, requires vacating the conviction for Counts One and Two in their entirety.  While the jury returned a special verdict form in this case that found two non-IGBA predicate acts proven, that cannot save the convictions for racketeering and racketeering conspiracy.  When it is determined on appeal that the government has not proven certain predicate acts beyond a reasonable doubt and it is "at least questionable whether … a jury would nonetheless have convicted" the defendant of the racketeering" in the absence of those invalidated predicate acts,

the racketeering convictions "cannot stand." *United States v. Biaggi,* 909 F.2d 662, 693 (2d Cir.1990), *cert. denied,* 499 U.S. 904 (1991.)

In *Biaggi*, a jury found the defendant guilty of racketeering and racketeering conspiracy charges for his role as chief executive officer of a company. The jury's interrogatories indicated that the racketeering convictions were premised on two mail fraud predicate acts, which were affirmed, and four bribery predicate acts, which were found invalid on appeal. This Court declined to affirm the racketeering convictions despite the remaining two predicate acts because the bribery allegations had thoroughly dominated that case. *Id.* Following the holding in *Biaggi*, this Court in *United States v. Delano*, 55 F.3d 720 (2d Cir. 1995), also refused to affirm RICO convictions despite two legally sufficient predicate acts remaining after certain larceny predicate acts had been vacated. Because the proof in *Delano* was primarily focused on the larceny crimes that had been vacated, "it would be too speculative to assume that, had the acts of larceny by extortion been properly removed from the jury's consideration, the jury would have found the two 'constituents of RICO pattern requirement,' a threat of continued criminal activity plus relatedness, solely on the basis of the two [remaining] predicates. *Delano*, 55 F.3d at729 (citing *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239 (1989)); *see also United States v. Tellier*, 83 F.3d 578, 581- 82 (2d Cir. 1996) (when racketeering convictions were premised on inadmissible hearsay testimony,

Hobbs Act conviction had to also be vacated "given the enormous amount of prejudicial spillover evidence admitted to prove the RICO 'enterprise' and its extensive criminal activities.")

Likewise, here, the trial was dominated by evidence of the purported gambling parlors. In its opening statement, the government's first description of the enterprise's activity was "running illegal gambling parlors in Chinatown and elsewhere. They were casual places. They were not high-end establishments. We are talking about rooms behind Chinatown storefronts. A lot of money was bet in these rooms. Hundreds of thousands of dollars of money a night and Lin's gang took a cut every day." A. 222. Nearly all of the fact witnesses provided extensive descriptions of the "gambling parlor" activities. *See, e.g.* A. 300 – 01, 486 – 89, 552, 555, 580, 599 – 601, 637. That testimony was critical to the government's efforts to establish an enterprise, as demonstrated by its summation, which led with a description of "a long pattern of crime and violent activity: gambling, assaults, stabbing, guns, extortion, and most significantly, murder." A. 667. The government led its detailed recitation of the enterprise's by turning "[f]irst to the gambling." A. 667. In describing internecine disputes between Mr. Lin and witnesses, the government described Mr. Lin as using violence and threats to obtain interests in gambling parlors. A. 668 – 69. When describing Mr. Lin's "business," the government consistently began with "gambling." A 670 – 71.

Having relied heavily on the testimony about "gambling" to establish the enterprise, it is far from clear that without such evidence a jury would have found that an enterprise had been established. Even if it did, however, given how extensively the testimony about "gambling" and the government's reliance on the gambling allegations were when describing Mr. Lin's racketeering activities, the gambling evidence necessarily spilled over into the jury's deliberations with respect to the remaining two racketeering acts: extortion and murder. In light of the bare threshold number of pattern acts supported by the record –two acts – and the government's extensive reliance on factually and legally unsubstantiated allegations that the activities at the parlors constituted "gambling" when describing both the enterprise and the pattern of racketeering, the convictions for Counts One and Two must be vacated.

## IV. Mr. Lin Was Unduly Prejudiced by the Government's Improper Rebuttal Summation

The government's rebuttal was a primer on improper argumentation. The prosecution's inappropriate statements fell, broadly speaking, into three categories: burden-shifting, vouching for witnesses and attacking defense counsel. Those errors, taken together, deprived Mr. Lin of his Sixth Amendment right to a fair trial and require reversal of the convictions here.

Reversal is called for when "(1) … the prosecutor's statements were improper and (2) … the remarks, taken in the context of the entire trial, resulted in

substantial prejudice." *United States v. Bautista*, 23 F.3d 726, 732 (2d Cir. 1994).

Substantial prejudice depends on the severity of the misconduct, the measures

adopted to cure it and the certainty of conviction in the absence of the misconduct.

*United States v. Friedman*, 909 F.2d 705, 709 (2d Cir. 1990).

It is "serious misconduct for the prosecutor to state that the defendant has his

own burden of proof." *United States v. Walker*, 835 F.2d 983, 988 (2d Cir. 1987.)

It is also "a given that a prosecutor may not personally vouch for the truth of the

governments evidence." *United States v. Miller*, 116 F.3d 641, 683 (2d Cir. 1997),

citing *United States v. Modica,* 663 F.2d 1173, 1178–79 (2d Cir.1981) *cert. denied,*

456 U.S. 989 (1982). Further, it is well-settled that the government may not

malign defense counsel when doing so "ignore[s] defense counsel's entirely

legitimate role as an advocate, discharging as important a responsibility in

representing the defendant as the prosecutor has in representing the United States."

*Frideman*, 909 F.3d at 709

The government committed all three categories of improper argument in this

case. For example, during rebuttal the prosecutor argued that:

- "[L]et's take a hard look at this alternative universe" (A. 682) (burden-shifting);
- "If it's all a lie, how does the defendant explain the evidence that couldn't have been fabricated? How does he explain his car at the scene? How does he explain his documents -- ?" (A. 684) (burden-shifting);
- "[T]he suggestion that we're somehow putting one over on all of you by not bringing Cash to testify, it needs to be addressed … . … It's our burden, he

59

doesn't need to do anything.  That said, he knows where Cash is." (A. 683)
(burden-shifting and attacking defense counsel);

- "If it wasn't Cash coordinating these lies, then was it someone else?  And
Mr. Cohen is a nice guy; he doesn't want to openly accuse the people in the
front table of fabricating this case.  He went out of his way to say he didn't
think that we made any promises to any of these witnesses.  But isn't he
really saying that the front table was a part of this?" (A. 683) (attacking
defense counsel);

- Defense counsel was "not saying that [witnesses] were mistaken; he's saying
that they lied.  Seriously, that's what he's saying.  The audacity of this
defense" (A. 682) (attacking defense counsel);

- "Is defense really saying that in the wake of this horrific murder, that these
three people came together and decided to frame Xing Lin?" (A. 683)
(attacking defense counsel and vouching);

- The witnesses "testified truthfully." (A. 684) (vouching)

- "People are testifying about events that happened nine years ago.  People
have come in and met with the government in 2010, in 2011, in 2012, and in
2013.  Do you really think that if you were called in --" (A. 684) (vouching).

While "proper instructions by the trial court may suffice to prevent undue

prejudice and make the misconduct harmless," in this case, the district court

offered no such curative instructions with respect to any of the errors in this case.

*Walker*, 835 F.2d at 988; *see also United States v. Cruz,* 797 F.2d 90, 93 n. 1 (2d

Cir.1986) (affirming a conviction despite prosecutor's language "[t]he defense ...

has to convince you," because it was cured by trial court's instructions).  Defense

counsel objected a dozen times to all of these lines of argument and subsequently

made a motion for a mistrial.  Though the trial court sustained two objections, and

on several occasions encouraged the prosecutor to move along, the court also

admonished defense counsel in front of the jury for objecting, saying that "[d]uring

60

closing arguments, we should not do much objecting." A. 684. The trial court never offered any curative instructions to the jury. The court's responses to the clearly improper rebuttal argument – which was the last thing the jury heard before deliberations – were wholly inadequate to remedy the harm done to Mr. Lin by the improper argumentation.

The prejudice here was also further aggravated because it occurred in rebuttal, at a point when the defense had no ability to challenge the prosecutor's statements to the jury or to present evidence to the contrary, and as the last thing of substance presented by the lawyers. *United States v. Sanchez*, 659 F.3d 1252, 1259 (9th Cir. 2011) ("Given the timing" of the improper arguments in the government rebuttal, "the impact was likely to be significant[.]")

As to the certainty of conviction absent the improper, unremedied statements, the evidence was not so overwhelming as to guarantee a conviction absent the improper rebuttal arguments. The government's fact witnesses with purported first-hand knowledge of the enterprise had been repeatedly impeached and shown to have lied under oath previously. The evidence of the enterprise and the relatedness of the predicate acts was largely unverified by forensic or other evidence. The jury carefully deliberated and asked several questions over the course of their deliberations, ultimately acquitting Mr. Lin of Count Five and

finding that one of the alternative versions of Racketeering Act Two had not been proven.

In light of the government's multiple and repeated improper statements, the total absence of any curative instructions and the less-than-overwhelming nature of the evidence here, Mr. Lin was deprived of his Sixth Amendment right to a fair trial and the convictions should be vacated.

## V. Multiple Errors Infected the Sentencing and Warrant Vacating the Sentence and Remanding for a New Sentencing Proceeding

A year and a half after trial, the district court sentenced Mr. Lin, imposing three life terms for Counts One, Two and Three and a twenty-year term for Count Four. SA. 1. In doing so, the court engaged in no analysis of the Sentencing Guidelines, no consideration of the 18 U.S.C. § 3553(a) sentencing factors and no explanation of the reasons supporting the sentence, beyond the seriousness of the crimes. The district court did not even state whether it was adopting the Probation Department's calculation of the Sentencing Guidelines, nor did it issue a statement of reasons for the sentence.

On appeal, sentences are reviewed under the "deferential abuse-of-discretion standard." *United States v. Cavera,* 550 F.3d 180, 189 (2d Cir.2008) (*en banc*) (internal quotation marks omitted). That review has two components: procedural review and substantive review. *Id.* The reviewing court "must first ensure that the district court committed no significant procedural error, such as failing to calculate

62

(or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence… . " *Gall v. United States,* 552 U.S. 38, 51 (2007).

Because Mr. Lin did not raise the sentencing errors before the district court, these challenges are reviewed for plain error. *Gamez*, 577 F.3d at 397. The plain error standard is applied "less 'stringently in the sentencing context, where the cost of correcting an unpreserved error is not as great as in the trial context.'" *United States v. Jones*, --- F.3d --- 2016 WL 3923838, *2, quoting *Gamez*, 577 F.3d at 397. Even under the plain error standard, the district court erred procedurally and substantively and the sentence here should be vacated with the matter remanded for resentencing.

### A. The Pre-Sentence Investigation Report and the Sentencing Proceeding

Prior to sentencing, the Probation Department prepared a Pre-Sentence Investigation Report ("PSR") that placed the various offenses into three groups. Group One covered the homicides and included Count One (racketeering conspiracy), Count Two's Racketeering Acts 1(a) and (b) (the murder of and conspiracy to murder Chang Qin Zhou in violation of New York State Penal Law §§ 125.25 and 105.15) and Count Three, the 18 U.S.C. § 924(j) conviction (use of the firearm resulting in the deaths of Chang Qin Zhou and Mei Ying Li). CA. 15.

63

Group Two covered the extortion and included Count One (racketeering conspiracy), Count Two's Racketeering Act 2(b) (the Hobbs Act extortion) and Count Four (the Hobbs Act extortion). CA. 15 – 16. Group Three covered the gambling offenses and included Count One (racketeering conspiracy) and Racketeering Acts Three, Four and Five (operation of the tien lin and mahjong parlors.) CA. 16.

Because the groups involved racketeering, the PSR consulted U.S.S.G. § 2E1.1, which directs that the greater of offense level 19 or the offense applicable to the underlying racketeering act should apply. As to Group One, because the acts underlying the racketeering charges in Group One were murder the PSR looked to U.S.S.G. § 2A, and applied U.S.S.G. § 2A1.1, the first degree murder guideline, thus starting with an offense level of 43. CA. 15. The PSR also included a four-point leadership enhancement under U.S.S.G. § 3B1.1(a). CA. 15. The PSR calculated the total offense level for Group One as 47. CA. 15. In calculating the offense level for Group Two, the PSR relied on U.S.S.G. § 2B3.2(c), which applies when a person was "killed under circumstances that would constitute murder under 18 U.S.C. § 1111" and directs that U.S.S.G. § 2A1.1 for first degree murder should apply. CA. 15. The PSR thus calculated a base offense level for Group Two of 43 and again added the four-point leadership enhancement under U.S.S.G. § 3B1.1(a), resulting in a total offense level for Group Two of 47. CA. 16. As to Group Three,

64

the PSR calculated a base offense level of 19 pursuant to U.S.S.G. § 2E1.1(a)(1), as the underlying acts of gambling had a level lower than 19. CA. 16.  It again added a four-point leadership enhancement under U.S.S.G. § 3B1.1(a) for a total offense level for Group Three of 23. CA. 17.

Under the multiple-count adjustment calculation, the PSR calculated a total offense level of 49, which was reduced to 43 under Chapter 5, Part A of the Sentencing Guidelines, which applies to those "rare cases" when a total offense level is higher than 43. CA. 17; U.S.S.G. Ch. 5, Pt. A, application note 2.  The Sentencing Guidelines range at offense level 43 for an offender in any criminal history category is life in prison.

At sentencing, the district court failed to engage in any Sentencing Guidelines calculation, not even cursorily adopting the PSR's calculations.  The court similarly omitted any analysis of the sentencing factors set forth in 18 U.S.C. § 3553(a).  Instead, in what appears to have been taken approximately 30 seconds (running less than ten lines on the transcript), the district court pronounced that the case was "very serious and heavy" and then sentenced Mr. Lin to life in prison on Counts One, Two and Three and a concurrent 20-year term on Count Four. A. 756. The judgment and commitment order did not contain a statement of reasons for the sentence imposed, nor did any other court filing. SA. 1.

65

**B.** **The District Court Committed Procedural Error in Failing to Conduct a Sentencing Guidelines Calculation, Failing to Engage in any 18 U.S.C. § 3553(a) Analysis and in its Bare Articulation About the Basis for the Imposed Sentence**

A district court is obligated to "begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall*, 552 U.S. at 49; U.S.S.G. § 1B1.1(b) (in calculating the Sentencing Guidelines range, a district court is instructed to "[d]etermine the base offense level and apply any appropriate specific offense characteristics … contained in the [applicable] guideline in Chapter Two.") A district court is also obligated to make specific factual findings to support its application of the Sentencing Guidelines. So, for example, the court must make findings "sufficient to support [an] … enhancement imposed … for being an organizer or leader." *United States v. Molina*, 356 F.3d 269, 275 (2d Cir. 2004). Indeed, Second Circuit "precedents are uniform in requiring a district court to make specific factual findings to support a sentence enhancement under U.S.S.G. § 3B1.1." *Id.* When a district court bases its sentence on findings contained in a PSR, it "must not only agree with that report, but must also adopt it 'expressly.'" *Id.*; *see also United States v. Payne*, 591 F.3d 46, 70 (2d Cir. 2010) (district court may satisfy its sentencing obligations when it filed "with the judgment a STATEMENT OF REASONS in which [the court] expressly state[s] that [it] adopt[s] the PSR," particularly when the record contains other discussions demonstrating that the court had engaged with defense counsel in a dispute over the applicable guidelines.)

66

By failing to calculate the Sentencing Guidelines, a court commits a quintessential "significant procedural error." *United States v. Savage*, 542 F.3d 959, 964 (2d Cir. 2008.)

The district court has a similar duty under 18 U.S.C. § 3553(a). A failure to weigh the factors set forth in the federal sentencing statute constitutes an abuse of discretion and when the record does not establish that a § 3553(a) analysis occurred, the sentence must be vacated. *United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013) (vacating sentences as procedurally unreasonable because it was unclear from the record whether the court had fulfilled its obligation to weigh the 18 U.S.C. § 3553(a) factors.)

Last, the absence of any articulation on the record beyond the cursory description of the facts in the case being serious is further proof of procedural sentencing error. "When a district court explains its sentencing decision, 'the length and level of detail required varies depending upon the circumstances.'" *United States v. Lopez*, 615 Fed. App'x 24 (2d Cir. 2015) (affirming when "sentence concerns a violation of probation and the ultimate sentence is within the recommended range," because under those circumstances "compliance with the statutory requirements can be minimal") (internal citation omitted.) In a case such as this one, when an offender with no prior criminal history of violence, convicted of his first felony after having attempted to plead guilty pursuant to an agreement

between the parties that the Sentencing Guidelines range was 10 years, spending

less than a minute in imposing a sentence of life in prison was woefully

inadequate.[23]

In the absence of any meaningful articulation from which a reviewing court

could ascertain the basis for the term of imprisonment imposed, the sentence must

be considered procedural unreasonable and be vacated.

## C. The PSR Miscalculated the Sentencing Guidelines Range.

Though the district court in this case failed to calculate or embrace the

PSR's calculation of the Sentencing Guidelines, even if by some imaginative

---

[23] The record also contains commentary from the court about Mr. Lin's ethnicity that could appear to a reasonable observer as having informed the sentence. When rejecting Mr. Lin's plea offer, the district court, appearing to think Mr. Lin was being intentionally evasive, announced "Chinese people are very intelligent. They know what they're doing. … Anything you can think of was invented in China thousands of years ago. They are extremely intelligent people." A. 87 – 88. When one witness of Chinese descent was having a hard time describing how old he was, the court explained "[w]e" – presumably westerners versus Chinese – "reckon age different." A. 610. When another Chinese witness demonstrated some facility in English, the court noted this in front of the jury, observing, "I see you know some English." A. 628. A defendant's "nationality may play no adverse role in the administration of justice, including at sentencing." *United States v. Leung,* 40 F.3d 577, 586 (2d Cir. 1994) (citations omitted); *see also* 28 U.S.C. § 994(d); U.S.S.G. § 5H1.10. Thus, when there is even the appearance that a sentence reflects a defendant's ethnicity, resentencing is required. *Leung*, 40 F.3d at 586 (vacating sentence that could reasonably be construed to be based, in part, on defendant's national origin.) While the statements here did not occur during sentencing, given the several occasions upon which the district court opined as to stereotypes of people of Chinese descent, a reasonable observer could infer that Mr. Lin's ethnic background played a role in the district court's determination of his sentence. These comments are a further factor weighing in favor of vacating the sentence.

stretch it could be claimed that the district court adopted the PSR – despite the absence of any record evidence supporting such an argument – the PSR here miscalculated the relevant Sentencing Guidelines and thus the sentence would still have to be vacated for procedural error.

In calculating an offense level for racketeering crimes with predicate acts that violate state law, the Sentencing Guidelines require courts to apply the guideline corresponding to the "most analogous federal offense." U.S.S.G. § 2E1.1, *cmt. n. 2*.

With respect to the Group One and Two offenses, the PSR assumed that the "most analogous federal offense" was first degree murder, and thus relied on U.S.S.G. § 2A1.1, the first degree murder guideline. Racketeering Act 1(a), however, was second-degree murder under New York State Penal Law, which should fall within the purview of the second-degree murder guideline in U.S.S.G. § 2A1.2, with a corresponding offense level of 38. Racketeering Act 1(b), the violation of 18 U.S.C. § 924(j)(1), which has as an element that the death caused by a firearm "is a murder (as defined in Section 1111)," also should have corresponded to the second-degree murder guideline in U.S.S.G. § 2A1.2 and the court's failure to address this issue constitutes procedural error.

The only textual differences between U.S.S.G. §§ 2A1.1 and 2A1.2 are (1) their titles ("First Degree Murder" compared to "Second Degree Murder") and (2)

69

their offense levels (43 compared to 38.)  Neither Sentencing Guideline contains

any description of the offense to which they correspond.  The commentary to §

2A1.1 says that it applies "in cases of premeditated killing," or when the death

resulted from certain enumerated felonies (none of which were at issue in this

case.) U.S.S.G. § 2A1.1, *cmt* 1.  Both §§ 2A1.1 and 2A1.2 refer in the commentary

to 18 U.S.C. § 1111, the federal murder statute, which defines murder (irrespective

of degree) as "the unlawful killing of a human being with malice aforethought,"

and then enumerates specific types of unlawful killing that are first-degree murder.

18 U.S.C. § 1111(a).

> Every  murder perpetrated by poison, lying in wait, or any other kind
> of willful, deliberate, malicious, and premeditated killing; or
> committed in the perpetration of, or attempt to perpetrate, any arson,
> escape, murder, kidnapping, treason, espionage, sabotage, aggravated
> sexual abuse or sexual abuse, child abuse, burglary, or robbery; or
> perpetrated as part of a pattern or practice of assault or torture against
> a child or children; or perpetrated from a premeditated design
> unlawfully and maliciously to effect the death of any human being
> other than him who is killed, is murder in the first degree.
>
> Any other murder is murder in the second degree.

*Id.*  The statute further sets forth sentences, dictating that for first degree murder a

sentence must be either "death or … imprisonment for life" while for second

degree murder it is "any term of years or life." 18 U.S.C. § 1111(b).

Here, there was no finding of premeditation.  To the contrary, as the

government expressly argued it was not required to prove premeditation for

purposes of any of the Group One murders. A. 659 – 60, 713 – 18.  Thus, none of the offenses forming the basis of the Group One convictions should have triggered the first-degree murder Sentencing Guideline.

Further, the sentence of life in prison for an offense level of 43 (which triggers a life term across the criminal history category board), conflicts with the statutory terms available for the offenses, all of which involved a term of year or life in prison.  When a Sentencing Guideline conflicts with a statute, "the statute controls," – in this case, the statute that includes a sentencing range between years and life in prison would control over the Sentencing Guideline with only life in prison as a sentence. *United States v. Smith*, 354 F.3d 171, 175 (2d Cir. 2003.)

Given that the Group One offenses did not fall within the definition  of first-degree murder and their applicable statutory sentencing ranges were between a term of years up to life in prison, the PSR should not have assumed that the most analogous guideline was U.S.S.G. § 2A1.1 and it erred in mechanistically applying the first degree murder guideline. *Jamison v. United States*, 4 Fed. App'x 88, 90 (2d Cir. 2001) (prior caselaw did not require that First Degree Murder guideline apply to predicate act of murder in violation of New York State Penal Law); *compare United States v. Carr*, 424 F.3d 213, 231 (2d Cir. 2005) (district court did not err when, after analysis, it applied first-degree murder Sentencing Guideline for

71

underlying racketeering act of second-degree murder in violation of New York State Penal Law.)

Likewise, the PSR erred in relying on U.S.S.G. § 2B3.2(c) to calculate a base offense level of 43 for the Group Two offenses. The Group Two offenses involved convictions for Hobbs Act extortion in violation of 18 U.S.C. § 1951, which carries a maximum sentence of 20 years in prison. Section 2B3.2(c) directs courts to apply the Sentencing Guideline for first-degree murder when a victim was killed in the course of activity falling within the extortion Guideline. This is in direct conflict with the sentences set forth in both 18 U.S.C. §§ 1951 and 1111. The maximum statutory sentence for the extortion crime is 20 years imprisonment and while the federal murder statute lists those activities that can give rise to a killing being first degree murder, extortion is not included. Had Congress intended an extortion-related killing to constitute first-degree murder, it would have been included in the exhaustive list set forth in the statute.[24] Because it is not, § 2B3.2(c), by directing application of the first-degree murder Guideline and the corresponding life sentence, is in direct conflict with the underlying statutes, which permit for a sentence of a term of years.

---

[24] That Congress authorized in 18 U.S.C. § 1959(1)(1) a separate crime of murder in aid of racketeering (with which Mr. Lin was not charged) that carries a mandatory life sentence, is further evidence that when murder is a predicate racketeering act – but was not "in aid of racketeering activities" – the predicate act should not be analogized to a crime with only a life sentence, and not a possible sentence of a term of years.

72

Last, because the correct Sentencing Guidelines ranges is "the starting point and initial benchmark" for federal sentences, it cannot be "lightly assume[d] that eliminating enhancements from the Guidelines range would not affect the sentence." *United States v. Feldman*, 647 F.3d 450, 459 – 60 (2d Cir. 2011) (affirming sentence on basis that enhancements were proper.) Thus, when the record is ambiguous as to whether the district court correctly understood the Sentencing Guidelines, remand is appropriate, even if the imposed sentence was statutorily authorized. *See United States v. Folkes*, 622 F.3d 152, 158 (2d Cir. 2010) (because district court's determination of an appropriate sentence was influenced by "a Guidelines range that was more than twice the correct range" remand for resentencing was appropriate); *United States v. Malki*, 609 F.3d 503, 511 (2d Cir. 2010) (remanding for resentencing because the record did not clearly indicate court would have imposed same sentence if it correctly understood the applicable Sentencing Guidelines range); *United States v. Sanchez*, 518 F.3d 651, 665 (2d Cir. 2008) (remanding when judge's "sentencing remarks create ambiguity as to whether the judge correctly understood an available [sentencing] option") (internal quotation marks and citation omitted).

The sentence in this case must thus be vacated and the matter remanded so that Mr. Lin can be resentenced after the district court correctly calculates the applicable range under the Sentencing Guidelines.

### D.     The Sentence Was Substantively Unreasonable

When reviewing a challenge to the substantive reasonableness of a sentence, this Court looks not only to whether "the trial court's decision can[] be located within the range of permissible decisions," but also "may consider whether a factor relied on by a sentencing court can bear the weight assigned to it . . . under the totality of circumstances in the case." *United States v. Cavera*, 550 F.3d 180, 189 - 191 (2d Cir. 2008) (internal quotations omitted).  While significant deference is afforded the district court's reasoning and ultimate conclusion with respect to sentence, "several courts, including [this one] have cautioned against converting review for substantive reasonableness into a 'rubber stamp.'" *United States v. Rigas*, 583 F.3d 108, 122 (2d Cir. 2009) (collecting cases); *see also United States v. Rattoballi*, 452 F.3d 127, 137 (2d Cir. 2006) ("unjustified reliance upon any one factor is a symptom of an unreasonable sentence").  "In cases where . . . the sentence imposed by the district court strains the bounds of reasonableness, remand for resentencing may well be warranted." *United States v. Ahuja*, 936 F.2d 85, 89 (2d Cir.1991); *see also United States v. Aldeen*, 792 F.3d 247, 255-56 (2d Cir. 2015), as amended (July 22, 2015) (remanded "for a fuller record" because "even if [the defendant's] sentence does not shock the conscience, it at the very least stirs the conscience"), citing *Ahuja*, 936 F.2d at 89.  A sentence of life without the possibility of parole is exceedingly rare in the federal system and is the

sort of sentence that strains at the bounds of reasonableness, demanding careful scrutiny. *See e.g.* Glenn R. Schmitt & Hyun J. Konfrst, *Life Sentences in the Federal System, United States Sentencing Commission* (February 2015) (as of January 2015, only 2.5% of all sentenced federal offenders are serving life sentences), available at ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and- surveys/miscellaneous/20150226_Life _Sentences.pdf, last accessed August 19, 2016.

Here, where someone with a minimal criminal history who aided and abetted those crimes carrying maximum terms of life – with evidence at trial that the discharge of the weapon was the result of a misunderstanding – with no explanation or analysis for the sentence beyond the seriousness of the case, sentencing Mr. Lin to spend the rest of his life in prison was substantively unreasonable. The sentence should be vacated and the matter remanded for resentencing on that basis, as well.

## CONCLUSION

For all of the reasons above, Xing Lin asks that: (1) his convictions be vacated and he be allowed to plead guilty to the previously authorized superseding information; (2) that his convictions be vacated (because of improper government rebuttal) and the case remanded for retrial; (3) that the convictions of Counts One, Two and Three be vacated (because Counts One and Two were unsupported by the

evidence and Count Three is legally insufficient), that Count Three be dismissed and the other counts remanded for retrial; or (4) that his sentence on all counts be vacated and the matter remanded for resentencing.

Dated this 24th day of August 2016.

Respectfully submitted,

By:  /s/ Megan Wolfe Benett
Megan Wolfe Benett, Esq.
750 Third Avenue
New York, NY 10017
Telephone: (212) 973-3406
Facsimile:  (212) 972-9432

*Attorney for Defendant-Appellant,*
*Xing Lin*

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to Fed.R.App.P. 32(a)(7)(B) and Second Circuit Rule 32-1, that this brief is reproduced using proportional typeface of Times New Roman, 14 points in size, is double-spaced and consists of 19,575 words, as calculated in the word count program in Microsoft Word, including footnotes and headings and quotations.

Dated: August 24, 2016

By _____ /s/ Megan Wolfe Benett

**SPECIAL APPENDIX**

# TABLE OF CONTENTS

**Page**

Judgment and Commitment Order ........................................................ SA. 1

18 U.S.C. § 924 ..................................................................................... SA. 8

18 U.S.C. § 1951 ................................................................................... SA. 17

18 U.S.C. § 1955 ................................................................................... SA. 18

18 U.S.C. § 1962 ................................................................................... SA. 20

18 U.S.C. § 3553 ................................................................................... SA. 21

Federal Rule of Criminal Procedure 11 .............................................. SA. 26

New York Penal Law § 125.25 .............................................................. SA. 30

New York Penal Law § 225.00 .............................................................. SA. 32

New York Penal Law § 225.05 .............................................................. SA. 37

United States Sentencing Guideline § 2A1.1 ....................................... SA. 38

United States Sentencing Guideline § 2A1.2 ....................................... SA. 40

United States Sentencing Guideline § 2B3.2 ....................................... SA. 41

United States Sentencing Guideline § 2E1.1 ....................................... SA. 44

United States Sentencing Guideline § 3B1.1 ....................................... SA. 46

i

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
           Sheet 1

# UNITED STATES DISTRICT COURT

Southern District of New York

| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
|---|---|---|
| **v.** | ) | |
| XING LIN a/k/a "Ding Pa" | ) | Case Number:    S2 11 CR 114-01 (MGC) |
| | ) | USM Number:    91751-054 |
| | ) | Joel S. Cohen, Esq. |
| | | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s)

☐ pleaded nolo contendere to count(s)
   which was accepted by the court.

X was found guilty on count(s)    1 through 4
   after a plea of not guilty.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/29/14

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. 1962(d) | Conspiracy to commit racketeering | 4/14/11 | 1 |
| 18 U.S.C. 1962(c) | Racketeering | 4/14/11 | 2 |
| 18 U.S.C. 924 (j)(1) and 2 | Murder through use of a firearm during and in relation to a crime of violence | 4/14/11 | 3 |
| 18 U.S.C. 1951 and 2 | Extortion | 4/14/11 | 4 |

The defendant is sentenced as provided in pages 2 through   7   of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

x The defendant has been found not guilty on count(s)   5

x Count(s)   All open counts    ☐ is   x are   dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

10/21/2014
Date of Imposition of Judgment

S/

Signature of Judge

Miriam Goldman Cedarbaum, U.S.D.J.
Name and Title of Judge

10/29/2014
Date

**SA. 1**

AO 245B   (Rev. 09/11) Judgment in Criminal Case
          Sheet 2 — Imprisonment

Judgment — Page   2   of   7

DEFENDANT:           XING LIN a/k/a "Ding Pa"
CASE NUMBER:         S2 11 CR 114-01 (MGC)

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

Counts 1, 2, and 3: Life Imprisonment

Count 4:  240 months (to run concurrently with Counts 1, 2, and 3)

x   The court makes the following recommendations to the Bureau of Prisons:
    The defendant shall be designated to the United States Penitentiary in Atlanta, Georgia

x   The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:

    ☐   at _____ ☐ a.m.  ☐ p.m.   on _____ .

    ☐   as notified by the United States Marshal.

☐   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐   before 2 p.m. on _____ .

    ☐   as notified by the United States Marshal.

    ☐   as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:




Defendant delivered on _____ to _____

a _____ , with a certified copy of this judgment.


_____
UNITED STATES MARSHAL

By _____
     DEPUTY UNITED STATES MARSHAL

SA. 2

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page    3    of    7

DEFENDANT:    XING LIN a/k/a "Ding Pa"
CASE NUMBER:    S2 11 CR 114-01 (MGC)

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :

No Supervised Release

      The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of placement on probation or supervised release and at least two unscheduled drug tests thereafter, as directed by the probation officer.

☐    The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. *(Check, if applicable.)*

☐    The defendant shall not possess a firearm or destructive device. *(Check, if applicable.)*

☐    The defendant shall cooperate in the collection of DNA as directed by the probation officer. *(Check, if applicable.)*

☐    The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense. *(Check, if applicable.)*

☐    The defendant shall participate in an approved program for domestic violence. *(Check, if applicable.)*

      If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

      The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

# STANDARD CONDITIONS OF SUPERVISION

1)    the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)    the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;

3)    the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)    the defendant shall support his or her dependents and meet other family responsibilities;

5)    the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)    the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)    the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)    the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)    the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)    the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)    the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)    the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13)    as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

**SA. 3**

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
           Sheet 3A — Supervised Release

Judgment—Page   4   of   7

DEFENDANT:        XING LIN a/k/a "Ding Pa"
CASE NUMBER:      S2 11 CR 114-01 (MGC)

## ADDITIONAL SUPERVISED RELEASE TERMS

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
           Sheet 4—Probation

Judgment—Page ___5___ of ___7___

DEFENDANT:       XING LIN a/k/a "Ding Pa"
CASE NUMBER:     S2 11 CR 114-01 (MGC)

# PROBATION

The defendant is hereby sentenced to probation for a term of :

The defendant shall not commit another federal, state or local crime.

   The defendant shall not unlawfully possess a controlled substance.  The defendant shall refrain from any unlawful use of a controlled substance.  The defendant shall submit to one drug test within 15 days of placement on probation and at least two periodic drug tests thereafter, as determined by the court.

☐  The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of

   future substance abuse.  *(Check, if applicable.)*

☐  The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.  *(Check, if applicable.)*

☐  The defendant shall cooperate in the collection of DNA as directed by the probation officer.  *(Check, if applicable.)*

☐  The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense.  *(Check, if applicable.)*

☐  The defendant shall participate in an approved program for domestic violence.  *(Check, if applicable.)*

      If this judgment imposes a fine or restitution, it is a condition of probation that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

      The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1)   the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)   the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;

3)   the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)   the defendant shall support his or her dependents and meet other family responsibilities;

5)   the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)   the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)   the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)   the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)   the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)  the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)  the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)  the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13)  as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

SA. 5

AO 245B  (Rev. 09/11) Judgment in a Criminal Case
        Sheet 5 — Criminal Monetary Penalties

Judgment — Page  6  of  7

DEFENDANT:          XING LIN a/k/a "Ding Pa"
CASE NUMBER:        S2 11 CR 114-01 (MGC)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $  400.00 | $ 25,000.00 | $  ** |

☐  The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|

**Separate order of restitution

| **TOTALS** | $ | $ |
|---|---|---|

☐  Restitution amount ordered pursuant to plea agreement  $ _____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐  the interest requirement is waived for the    ☐  fine   ☐  restitution.

    ☐  the interest requirement for the    ☐  fine   ☐  restitution is modified as follows:

**SA. 6**

AO 245B  (Rev. 09/11) Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page ___7___ of ___7___

DEFENDANT:     XING LIN a/k/a "Ding Pa"
CASE NUMBER:   S2 11 CR 114-01 (MGC)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☐ Lump sum payment of $ _____ due immediately, balance due

    ☐ not later than _____ , or
    ☐ in accordance ☐ C, ☐ D, ☐ E, or ☐ F below; or

**B** ☐ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

**C** ☐ Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**D** ☐ Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** x Special instructions regarding the payment of criminal monetary penalties:

    If the defendant is engaged in a BOP non-UNICOR program, the defendant shall pay $25 per quarter toward the criminal financial penalties. However, if the defendant participates in the BOP's UNICOR program as a grade 1 through 4, the defendant shall pay 50% of his monthly UNICOR earnings toward the criminal financial penalties, consistent with BOP regulations at 28 C.F.R. section 545.11

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

    Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

**SA. 7**

---

> United States Code Annotated
>  Title 18. Crimes and Criminal Procedure (Refs & Annos)
>   Part I. Crimes (Refs & Annos)
>    Chapter 44. Firearms (Refs & Annos)

18 U.S.C.A. § 924

§ 924. Penalties

Effective: October 6, 2006
Currentness

**(a)(1)** Except as otherwise provided in this subsection, subsection (b), (c), (f), or (p) of this section, or in section 929, whoever--

**(A)** knowingly makes any false statement or representation with respect to the information required by this chapter to be kept in the records of a person licensed under this chapter or in applying for any license or exemption or relief from disability under the provisions of this chapter;

**(B)** knowingly violates subsection (a)(4), (f), (k), or (q) of section 922;

**(C)** knowingly imports or brings into the United States or any possession thereof any firearm or ammunition in violation of section 922(l); or

**(D)** willfully violates any other provision of this chapter,

shall be fined under this title, imprisoned not more than five years, or both.

**(2)** Whoever knowingly violates subsection (a)(6), (d), (g), (h), (i), (j), or (o) of section 922 shall be fined as provided in this title, imprisoned not more than 10 years, or both.

**(3)** Any licensed dealer, licensed importer, licensed manufacturer, or licensed collector who knowingly--

**(A)** makes any false statement or representation with respect to the information required by the provisions of this chapter to be kept in the records of a person licensed under this chapter, or

**(B)** violates subsection (m) of section 922,

shall be fined under this title, imprisoned not more than one year, or both.

---

**(4)** Whoever violates section 922(q) shall be fined under this title, imprisoned for not more than 5 years, or both. Notwithstanding any other provision of law, the term of imprisonment imposed under this paragraph shall not run concurrently with any other term of imprisonment imposed under any other provision of law. Except for the authorization of a term of imprisonment of not more than 5 years made in this paragraph, for the purpose of any other law a violation of section 922(q) shall be deemed to be a misdemeanor.

**(5)** Whoever knowingly violates subsection (s) or (t) of section 922 shall be fined under this title, imprisoned for not more than 1 year, or both.

**(6)(A)(i)** A juvenile who violates section 922(x) shall be fined under this title, imprisoned not more than 1 year, or both, except that a juvenile described in clause (ii) shall be sentenced to probation on appropriate conditions and shall not be incarcerated unless the juvenile fails to comply with a condition of probation.

**(ii)** A juvenile is described in this clause if--

**(I)** the offense of which the juvenile is charged is possession of a handgun or ammunition in violation of section 922(x)(2); and

**(II)** the juvenile has not been convicted in any court of an offense (including an offense under section 922(x) or a similar State law, but not including any other offense consisting of conduct that if engaged in by an adult would not constitute an offense) or adjudicated as a juvenile delinquent for conduct that if engaged in by an adult would constitute an offense.

**(B)** A person other than a juvenile who knowingly violates section 922(x)--

**(i)** shall be fined under this title, imprisoned not more than 1 year, or both; and

**(ii)** if the person sold, delivered, or otherwise transferred a handgun or ammunition to a juvenile knowing or having reasonable cause to know that the juvenile intended to carry or otherwise possess or discharge or otherwise use the handgun or ammunition in the commission of a crime of violence, shall be fined under this title, imprisoned not more than 10 years, or both.

**(7)** Whoever knowingly violates section 931 shall be fined under this title, imprisoned for not more than 3 years, or both.

**(b)** Whoever, with intent to commit therewith an offense punishable by imprisonment for a term exceeding one year, or with knowledge or reasonable cause to believe that an offense punishable by imprisonment for a term exceeding one year is to be committed therewith, ships, transports, or receives a firearm or any ammunition in interstate or foreign commerce shall be fined under this title, or imprisoned not more than ten years, or both.

**(c)(1)(A)** Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a

Case 14-4133, Document 61, 08/24/2016, 1848596, Page96 of 133

crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime--

    **(i)** be sentenced to a term of imprisonment of not less than 5 years;

    **(ii)** if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and

    **(iii)** if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

**(B)** If the firearm possessed by a person convicted of a violation of this subsection--

    **(i)** is a short-barreled rifle, short-barreled shotgun, or semiautomatic assault weapon, the person shall be sentenced to a term of imprisonment of not less than 10 years; or

    **(ii)** is a machinegun or a destructive device, or is equipped with a firearm silencer or firearm muffler, the person shall be sentenced to a term of imprisonment of not less than 30 years.

**(C)** In the case of a second or subsequent conviction under this subsection, the person shall--

    **(i)** be sentenced to a term of imprisonment of not less than 25 years; and

    **(ii)** if the firearm involved is a machinegun or a destructive device, or is equipped with a firearm silencer or firearm muffler, be sentenced to imprisonment for life.

**(D)** Notwithstanding any other provision of law--

    **(i)** a court shall not place on probation any person convicted of a violation of this subsection; and

    **(ii)** no term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment imposed on the person, including any term of imprisonment imposed for the crime of violence or drug trafficking crime during which the firearm was used, carried, or possessed.

**(2)** For purposes of this subsection, the term "drug trafficking crime" means any felony punishable under the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or chapter 705 of title 46.

**(3)** For purposes of this subsection the term "crime of violence" means an offense that is a felony and--

**(A)** has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

**(B)** that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

**(4)** For purposes of this subsection, the term "brandish" means, with respect to a firearm, to display all or part of the firearm, or otherwise make the presence of the firearm known to another person, in order to intimidate that person, regardless of whether the firearm is directly visible to that person.

**(5)** Except to the extent that a greater minimum sentence is otherwise provided under this subsection, or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries armor piercing ammunition, or who, in furtherance of any such crime, possesses armor piercing ammunition, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime or conviction under this section--

**(A)** be sentenced to a term of imprisonment of not less than 15 years; and

**(B)** if death results from the use of such ammunition--

**(i)** if the killing is murder (as defined in section 1111), be punished by death or sentenced to a term of imprisonment for any term of years or for life; and

**(ii)** if the killing is manslaughter (as defined in section 1112), be punished as provided in section 1112.

**(d)(1)** Any firearm or ammunition involved in or used in any knowing violation of subsection (a)(4), (a)(6), (f), (g), (h), (i), (j), or (k) of section 922, or knowing importation or bringing into the United States or any possession thereof any firearm or ammunition in violation of section 922(l), or knowing violation of section 924, or willful violation of any other provision of this chapter or any rule or regulation promulgated thereunder, or any violation of any other criminal law of the United States, or any firearm or ammunition intended to be used in any offense referred to in paragraph (3) of this subsection, where such intent is demonstrated by clear and convincing evidence, shall be subject to seizure and forfeiture, and all provisions of the Internal Revenue Code of 1986 relating to the seizure, forfeiture, and disposition of firearms, as defined in section 5845(a) of that Code, shall, so far as applicable, extend to seizures and forfeitures under the provisions of this chapter: *Provided,* That upon acquittal of the owner or possessor, or dismissal of the charges against him other than upon motion of the Government prior to trial, or lapse of or court termination of the restraining order to which he is subject, the seized or relinquished firearms or ammunition shall be returned forthwith to the owner or possessor or to a person delegated by the owner or possessor unless the return of the firearms or ammunition would place the owner or possessor or his delegate in violation of law. Any action or proceeding for the forfeiture of firearms or ammunition shall be commenced within one hundred and twenty days of such seizure.

Case 14-4133, Document 61, 08/24/2016, 1848596, Page98 of 133

**(2)(A)** In any action or proceeding for the return of firearms or ammunition seized under the provisions of this chapter, the court shall allow the prevailing party, other than the United States, a reasonable attorney's fee, and the United States shall be liable therefor.

**(B)** In any other action or proceeding under the provisions of this chapter, the court, when it finds that such action was without foundation, or was initiated vexatiously, frivolously, or in bad faith, shall allow the prevailing party, other than the United States, a reasonable attorney's fee, and the United States shall be liable therefor.

**(C)** Only those firearms or quantities of ammunition particularly named and individually identified as involved in or used in any violation of the provisions of this chapter or any rule or regulation issued thereunder, or any other criminal law of the United States or as intended to be used in any offense referred to in paragraph (3) of this subsection, where such intent is demonstrated by clear and convincing evidence, shall be subject to seizure, forfeiture, and disposition.

**(D)** The United States shall be liable for attorneys' fees under this paragraph only to the extent provided in advance by appropriation Acts.

**(3)** The offenses referred to in paragraphs (1) and (2)(C) of this subsection are--

**(A)** any crime of violence, as that term is defined in section 924(c)(3) of this title;

**(B)** any offense punishable under the Controlled Substances Act (21 U.S.C. 801 et seq.) or the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.);

**(C)** any offense described in section 922(a)(1), 922(a)(3), 922(a)(5), or 922(b)(3) of this title, where the firearm or ammunition intended to be used in any such offense is involved in a pattern of activities which includes a violation of any offense described in section 922(a)(1), 922(a)(3), 922(a)(5), or 922(b)(3) of this title;

**(D)** any offense described in section 922(d) of this title where the firearm or ammunition is intended to be used in such offense by the transferor of such firearm or ammunition;

**(E)** any offense described in section 922(i), 922(j), 922(l), 922(n), or 924(b) of this title; and

**(F)** any offense which may be prosecuted in a court of the United States which involves the exportation of firearms or ammunition.

**(e)(1)** In the case of a person who violates section 922(g) of this title and has three previous convictions by any court referred to in section 922(g)(1) of this title for a violent felony or a serious drug offense, or both, committed on occasions different from one another, such person shall be fined under this title and imprisoned not less than fifteen years, and, notwithstanding any other provision of law, the court shall not suspend the sentence of, or grant a probationary sentence to, such person with respect to the conviction under section 922(g).

**(2)** As used in this subsection--

**(A)** the term "serious drug offense" means--

**(i)** an offense under the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or chapter 705 of title 46, for which a maximum term of imprisonment of ten years or more is prescribed by law; or

**(ii)** an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)), for which a maximum term of imprisonment of ten years or more is prescribed by law;

**(B)** the term "violent felony" means any crime punishable by imprisonment for a term exceeding one year, or any act of juvenile delinquency involving the use or carrying of a firearm, knife, or destructive device that would be punishable by imprisonment for such term if committed by an adult, that--

**(i)** has as an element the use, attempted use, or threatened use of physical force against the person of another; or

**(ii)** is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another; and

**(C)** the term "conviction" includes a finding that a person has committed an act of juvenile delinquency involving a violent felony.

**(f)** In the case of a person who knowingly violates section 922(p), such person shall be fined under this title, or imprisoned not more than 5 years, or both.

**(g)** Whoever, with the intent to engage in conduct which--

**(1)** constitutes an offense listed in section 1961(1),

**(2)** is punishable under the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or chapter 705 of title 46,

**(3)** violates any State law relating to any controlled substance (as defined in section 102(6) of the Controlled Substances Act (21 U.S.C. 802(6))), or

**(4)** constitutes a crime of violence (as defined in subsection (c)(3)),

travels from any State or foreign country into any other State and acquires, transfers, or attempts to acquire or transfer, a firearm in such other State in furtherance of such purpose, shall be imprisoned not more than 10 years, fined in accordance with this title, or both.

**(h)** Whoever knowingly transfers a firearm, knowing that such firearm will be used to commit a crime of violence (as defined in subsection (c)(3)) or drug trafficking crime (as defined in subsection (c)(2)) shall be imprisoned not more than 10 years, fined in accordance with this title, or both.

**(i)(1)** A person who knowingly violates section 922(u) shall be fined under this title, imprisoned not more than 10 years, or both.

**(2)** Nothing contained in this subsection shall be construed as indicating an intent on the part of Congress to occupy the field in which provisions of this subsection operate to the exclusion of State laws on the same subject matter, nor shall any provision of this subsection be construed as invalidating any provision of State law unless such provision is inconsistent with any of the purposes of this subsection.

**(j)** A person who, in the course of a violation of subsection (c), causes the death of a person through the use of a firearm, shall--

    **(1)** if the killing is a murder (as defined in section 1111), be punished by death or by imprisonment for any term of years or for life; and

    **(2)** if the killing is manslaughter (as defined in section 1112), be punished as provided in that section.

**(k)** A person who, with intent to engage in or to promote conduct that--

    **(1)** is punishable under the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or chapter 705 of title 46;

    **(2)** violates any law of a State relating to any controlled substance (as defined in section 102 of the Controlled Substances Act, 21 U.S.C. 802); or

    **(3)** constitutes a crime of violence (as defined in subsection (c)(3)),

smuggles or knowingly brings into the United States a firearm, or attempts to do so, shall be imprisoned not more than 10 years, fined under this title, or both.

**(l)** A person who steals any firearm which is moving as, or is a part of, or which has moved in, interstate or foreign commerce shall be imprisoned for not more than 10 years, fined under this title, or both.

**(m)** A person who steals any firearm from a licensed importer, licensed manufacturer, licensed dealer, or licensed collector shall be fined under this title, imprisoned not more than 10 years, or both.

**(n)** A person who, with the intent to engage in conduct that constitutes a violation of section 922(a)(1)(A), travels from any State or foreign country into any other State and acquires, or attempts to acquire, a firearm in such other State in furtherance of such purpose shall be imprisoned for not more than 10 years.

**(o)** A person who conspires to commit an offense under subsection (c) shall be imprisoned for not more than 20 years, fined under this title, or both; and if the firearm is a machinegun or destructive device, or is equipped with a firearm silencer or muffler, shall be imprisoned for any term of years or life.

**(p) Penalties relating to secure gun storage or safety device.--**

**(1) In general.--**

**(A) Suspension or revocation of license; civil penalties.--**With respect to each violation of section 922(z)(1) by a licensed manufacturer, licensed importer, or licensed dealer, the Secretary may, after notice and opportunity for hearing--

**(i)** suspend for not more than 6 months, or revoke, the license issued to the licensee under this chapter that was used to conduct the firearms transfer; or

**(ii)** subject the licensee to a civil penalty in an amount equal to not more than $2,500.

**(B) Review.--**An action of the Secretary under this paragraph may be reviewed only as provided under section 923(f).

**(2) Administrative remedies.--**The suspension or revocation of a license or the imposition of a civil penalty under paragraph (1) shall not preclude any administrative remedy that is otherwise available to the Secretary.

**CREDIT(S)**

(Added Pub.L. 90-351, Title IV, § 902, June 19, 1968, 82 Stat. 233; amended Pub.L. 90-618, Title I, § 102, Oct. 22, 1968, 82 Stat. 1223; Pub.L. 91-644, Title II, § 13, Jan. 2, 1971, 84 Stat. 1889; Pub.L. 98-473, Title II, §§ 223(a), 1005(a), Oct. 12, 1984, 98 Stat. 2028, 2138; Pub.L. 99-308, § 104(a), May 19, 1986, 100 Stat. 456; Pub.L. 99-570, Title I, § 1402, Oct. 27, 1986, 100 Stat. 3207-39; Pub.L. 100-649, § 2(b), (f)(2)(B), (D), Nov. 10, 1988, 102 Stat. 3817, 3818; Pub.L. 100-690, Title VI, §§ 6211, 6212, 6451, 6460, 6462, Title VII, §§ 7056, 7060(a), Nov. 18, 1988, 102 Stat. 4359, 4360, 4371, 4373, 4374, 4402, 4403; Pub.L. 101-647, Title XI, § 1101, Title XVII, § 1702(b)(3), Title XXII, §§ 2203(d), 2204(c), Title XXXV, §§ 3526, 3527, 3528, 3529, Nov. 29, 1990, 104 Stat. 4829, 4845, 4857, 4924; Pub.L. 103-159, Title I, § 102(c), Title III, § 302(d), Nov. 30, 1993, 107 Stat. 1541, 1545; Pub.L. 103-322, Title VI, § 60013, Title XI, §§ 110102(c), 110103(c), 110105(2), 110201(b), 110401(e), 110503, 110504(a), 110507, 110510, 110515(a), 110517, 110518(a), Title XXXIII, §§ 330002(h), 330003(f)(2), 330011(i), (j), 330016(1)(H), (K), (L), Sept. 13, 1994, 108 Stat. 1973, 1998, 1999, 2000, 2011, 2015, 2016, 2018, 2019, 2020, 2140, 2141, 2145, 2147; Pub.L. 104-294, Title VI, § 603(m)(1), (n) to (p)(1), (q) to (s), Oct. 11, 1996, 110 Stat. 3505; Pub.L. 105-386, § 1(a), Nov. 13, 1998, 112 Stat. 3469; Pub.L. 107-273, Div. B, Title IV, § 4002(d)(1)(E),

Case 14-4133, Document 61, 08/24/2016, 1848596, Page102 of 133

Div. C, Title I, § 11009(e)(3), Nov. 2, 2002, 116 Stat. 1809, 1821; Pub.L. 109-92, §§ 5(c)(2), 6(b), Oct. 26, 2005, 119 Stat. 2100, 2102; Pub.L. 109-304, § 17(d)(3), Oct. 6, 2006, 120 Stat. 1707.)

18 U.S.C.A. § 924, 18 USCA § 924
Current through P.L. 114-219.

**End of Document**                                             © 2016 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part I. Crimes (Refs & Annos)
      Chapter 95. Racketeering (Refs & Annos)

18 U.S.C.A. § 1951

§ 1951. Interference with commerce by threats or violence

Currentness

**(a)** Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

**(b)** As used in this section--

**(1)** The term "robbery" means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.

**(2)** The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

**(3)** The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

**(c)** This section shall not be construed to repeal, modify or affect section 17 of Title 15, sections 52, 101-115, 151-166 of Title 29 or sections 151-188 of Title 45.

**CREDIT(S)**

(June 25, 1948, c. 645, 62 Stat. 793; Pub.L. 103-322, Title XXXIII, § 330016(1)(L), Sept. 13, 1994, 108 Stat. 2147.)

18 U.S.C.A. § 1951, 18 USCA § 1951
Current through P.L. 114-219.

End of Document

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part I. Crimes (Refs & Annos)
      Chapter 95. Racketeering (Refs & Annos)

18 U.S.C.A. § 1955

§ 1955. Prohibition of illegal gambling businesses

Effective: December 18, 2014
Currentness

**(a)** Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined under this title or imprisoned not more than five years, or both.

**(b)** As used in this section--

**(1)** "illegal gambling business" means a gambling business which--

**(i)** is a violation of the law of a State or political subdivision in which it is conducted;

**(ii)** involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

**(iii)** has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

**(2)** "insured credit union" shall have the meaning given the term in section 101 of the Federal Credit Union Act (12 U.S.C. 1752).

**(3)** "insured depository institution" shall have the meaning given the term in section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813).

**(4)** "gambling" includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.

**(5)** "savings promotion raffle" means a contest in which the sole consideration required for a chance of winning designated prizes is obtained by the deposit of a specified amount of money in a savings account or other savings program, where each ticket or entry has an equal chance of being drawn, such contest being subject to regulations that may from time to time be promulgated by the appropriate prudential regulator (as defined in section 1002 of the Consumer Financial Protection Act of 2010 (12 U.S.C. 5481)).

**(6)** "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

**(c)** If five or more persons conduct, finance, manage, supervise, direct, or own all or part of a gambling business and such business operates for two or more successive days, then, for the purpose of obtaining warrants for arrests, interceptions, and other searches and seizures, probable cause that the business receives gross revenue in excess of $2,000 in any single day shall be deemed to have been established.

**(d)** Any property, including money, used in violation of the provisions of this section may be seized and forfeited to the United States. All provisions of law relating to the seizures, summary, and judicial forfeiture procedures, and condemnation of vessels, vehicles, merchandise, and baggage for violation of the customs laws; the disposition of such vessels, vehicles, merchandise, and baggage or the proceeds from such sale; the remission or mitigation of such forfeitures; and the compromise of claims and the award of compensation to informers in respect of such forfeitures shall apply to seizures and forfeitures incurred or alleged to have been incurred under the provisions of this section, insofar as applicable and not inconsistent with such provisions. Such duties as are imposed upon the collector of customs or any other person in respect to the seizure and forfeiture of vessels, vehicles, merchandise, and baggage under the customs laws shall be performed with respect to seizures and forfeitures of property used or intended for use in violation of this section by such officers, agents, or other persons as may be designated for that purpose by the Attorney General.

**(e)** This section shall not apply to--

**(1)** any bingo game, lottery, or similar game of chance conducted by an organization exempt from tax under paragraph (3) of subsection (c) of section 501 of the Internal Revenue Code of 1986, as amended, if no part of the gross receipts derived from such activity inures to the benefit of any private shareholder, member, or employee of such organization except as compensation for actual expenses incurred by him in the conduct of such activity; or

**(2)** any savings promotion raffle.

**CREDIT(S)**

(Added Pub.L. 91-452, Title VIII, § 803(a), Oct. 15, 1970, 84 Stat. 937; amended Pub.L. 99-514, § 2, Oct. 22, 1986, 100 Stat. 2095; Pub.L. 103-322, Title XXXIII, § 330016(1)(N), Sept. 13, 1994, 108 Stat. 2148; Pub.L. 113-251, § 5(3), Dec. 18, 2014, 128 Stat. 2891.)

18 U.S.C.A. § 1955, 18 USCA § 1955
Current through P.L. 114-219.

---

**End of Document**          © 2016 Thomson Reuters. No claim to original U.S. Government Works.

---

---

United States Code Annotated
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part I. Crimes (Refs & Annos)
      Chapter 96. Racketeer Influenced and Corrupt Organizations (Refs & Annos)

---

18 U.S.C.A. § 1962

§ 1962. Prohibited activities

Currentness

**(a)** It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

**(b)** It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

**(c)** It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

**(d)** It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

**CREDIT(S)**

(Added Pub.L. 91-452, Title IX, § 901(a), Oct. 15, 1970, 84 Stat. 942; amended Pub.L. 100-690, Title VII, § 7033, Nov. 18, 1988, 102 Stat. 4398.)

18 U.S.C.A. § 1962, 18 USCA § 1962
Current through P.L. 114-219.

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

> United States Code Annotated
>     Title 18. Crimes and Criminal Procedure (Refs & Annos)
>         Part II. Criminal Procedure
>             Chapter 227. Sentences (Refs & Annos)
>                 Subchapter A. General Provisions (Refs & Annos)

18 U.S.C.A. § 3553

§ 3553. Imposition of a sentence

Effective: May 27, 2010

Currentness

**(a) Factors to be considered in imposing a sentence.**--The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--

**(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;

**(2)** the need for the sentence imposed--

**(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

**(B)** to afford adequate deterrence to criminal conduct;

**(C)** to protect the public from further crimes of the defendant; and

**(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

**(3)** the kinds of sentences available;

**(4)** the kinds of sentence and the sentencing range established for--

**(A)** the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--

**(i)** issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

(B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

(5) any pertinent policy statement--

(A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced. [1]

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

(b) Application of guidelines in imposing a sentence.--

(1) In general.--Except as provided in paragraph (2), the court shall impose a sentence of the kind, and within the range, referred to in subsection (a)(4) unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described. In determining whether a circumstance was adequately taken into consideration, the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission. In the absence of an applicable sentencing guideline, the court shall impose an appropriate sentence, having due regard for the purposes set forth in subsection (a)(2). In the absence of an applicable sentencing guideline in the case of an offense other than a petty offense, the court shall also have due regard for the relationship of the sentence imposed to sentences prescribed by guidelines applicable to similar offenses and offenders, and to the applicable policy statements of the Sentencing Commission.

(2) Child crimes and sexual offenses.--

(A) [2] Sentencing.--In sentencing a defendant convicted of an offense under section 1201 involving a minor victim, an offense under section 1591, or an offense under chapter 71, 109A, 110, or 117, the court shall impose a sentence of the kind, and within the range, referred to in subsection (a)(4) unless--

(i) the court finds that there exists an aggravating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence greater than that described;

(ii) the court finds that there exists a mitigating circumstance of a kind or to a degree, that--

(I) has been affirmatively and specifically identified as a permissible ground of downward departure in the sentencing guidelines or policy statements issued under section 994(a) of title 28, taking account of any amendments to such sentencing guidelines or policy statements by Congress;

(II) has not been taken into consideration by the Sentencing Commission in formulating the guidelines; and

(III) should result in a sentence different from that described; or

(iii) the court finds, on motion of the Government, that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense and that this assistance established a mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence lower than that described.

In determining whether a circumstance was adequately taken into consideration, the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission, together with any amendments thereto by act of Congress. In the absence of an applicable sentencing guideline, the court shall impose an appropriate sentence, having due regard for the purposes set forth in subsection (a)(2). In the absence of an applicable sentencing guideline in the case of an offense other than a petty offense, the court shall also have due regard for the relationship of the sentence imposed to sentences prescribed by guidelines applicable to similar offenses and offenders, and to the applicable policy statements of the Sentencing Commission, together with any amendments to such guidelines or policy statements by act of Congress.

(c) **Statement of reasons for imposing a sentence**.--The court, at the time of sentencing, shall state in open court the reasons for its imposition of the particular sentence, and, if the sentence--

(1) is of the kind, and within the range, described in subsection (a)(4) and that range exceeds 24 months, the reason for imposing a sentence at a particular point within the range; or

(2) is not of the kind, or is outside the range, described in subsection (a)(4), the specific reason for the imposition of a sentence different from that described, which reasons must also be stated with specificity in a statement of reasons form issued under section 994(w)(1)(B) of title 28, except to the extent that the court relies upon statements received in camera in accordance with Federal Rule of Criminal Procedure 32. In the event that the court relies upon statements received in camera in accordance with Federal Rule of Criminal Procedure 32 the court shall state that such statements were so received and that it relied upon the content of such statements.

If the court does not order restitution, or orders only partial restitution, the court shall include in the statement the reason therefor. The court shall provide a transcription or other appropriate public record of the court's statement of reasons,

Case 14-4133, Document 61, 08/24/2016, 1848596, Page110 of 133

together with the order of judgment and commitment, to the Probation System and to the Sentencing Commission,, [3] and, if the sentence includes a term of imprisonment, to the Bureau of Prisons.

**(d) Presentence procedure for an order of notice**.--Prior to imposing an order of notice pursuant to section 3555, the court shall give notice to the defendant and the Government that it is considering imposing such an order. Upon motion of the defendant or the Government, or on its own motion, the court shall--

**(1)** permit the defendant and the Government to submit affidavits and written memoranda addressing matters relevant to the imposition of such an order;

**(2)** afford counsel an opportunity in open court to address orally the appropriateness of the imposition of such an order; and

**(3)** include in its statement of reasons pursuant to subsection (c) specific reasons underlying its determinations regarding the nature of such an order.

Upon motion of the defendant or the Government, or on its own motion, the court may in its discretion employ any additional procedures that it concludes will not unduly complicate or prolong the sentencing process.

**(e) Limited authority to impose a sentence below a statutory minimum.**--Upon motion of the Government, the court shall have the authority to impose a sentence below a level established by statute as a minimum sentence so as to reflect a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense. Such sentence shall be imposed in accordance with the guidelines and policy statements issued by the Sentencing Commission pursuant to section 994 of title 28, United States Code.

**(f) Limitation on applicability of statutory minimums in certain cases.**--Notwithstanding any other provision of law, in the case of an offense under section 401, 404, or 406 of the Controlled Substances Act (21 U.S.C. 841, 844, 846) or section 1010 or 1013 of the Controlled Substances Import and Export Act (21 U.S.C. 960, 963), the court shall impose a sentence pursuant to guidelines promulgated by the United States Sentencing Commission under section 994 of title 28 without regard to any statutory minimum sentence, if the court finds at sentencing, after the Government has been afforded the opportunity to make a recommendation, that--

**(1)** the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines;

**(2)** the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

**(3)** the offense did not result in death or serious bodily injury to any person;

**(4)** the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in section 408 of the Controlled Substances Act; and

**(5)** not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

**CREDIT(S)**

(Added Pub.L. 98-473, Title II, § 212(a)(2), Oct. 12, 1984, 98 Stat. 1989; amended Pub.L. 99-570, Title I, § 1007(a), Oct. 27, 1986, 100 Stat. 3207-7; Pub.L. 99-646, §§ 8(a), 9(a), 80(a), 81(a), Nov. 10, 1986, 100 Stat. 3593, 3619; Pub.L. 100-182, §§ 3, 16(a), 17, Dec. 7, 1987, 101 Stat. 1266, 1269, 1270; Pub.L. 100-690, Title VII, § 7102, Nov. 18, 1988, 102 Stat. 4416; Pub.L. 103-322, Title VIII, § 80001(a), Title XXVIII, § 280001, Sept. 13, 1994, 108 Stat. 1985, 2095; Pub.L. 104-294, Title VI, § 601(b)(5), (6), (h), Oct. 11, 1996, 110 Stat. 3499, 3500; Pub.L. 107-273, Div. B, Title IV, § 4002(a)(8), Nov. 2, 2002, 116 Stat. 1807; Pub.L. 108-21, Title IV, § 401(a), (c), (j)(5), Apr. 30, 2003, 117 Stat. 667, 669, 673; Pub.L. 111-174, § 4, May 27, 2010, 124 Stat. 1216.)

Footnotes

| | |
|---|---|
| 1 | So in original. The period probably should be a semicolon. |
| 2 | So in original. No subpar. (B) has been enacted. |
| 3 | So in original. The second comma probably should not appear. |

18 U.S.C.A. § 3553, 18 USCA § 3553
Current through P.L. 114-219.

---

End of Document

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
　Federal Rules of Criminal Procedure for the United States District Courts (Refs & Annos)
　　IV. Arraignment and Preparation for Trial

Federal Rules of Criminal Procedure, Rule 11

Rule 11. Pleas

Currentness

**(a) Entering a Plea.**

  **(1) In General.** A defendant may plead not guilty, guilty, or (with the court's consent) nolo contendere.

  **(2) Conditional Plea.** With the consent of the court and the government, a defendant may enter a conditional plea of guilty or nolo contendere, reserving in writing the right to have an appellate court review an adverse determination of a specified pretrial motion. A defendant who prevails on appeal may then withdraw the plea.

  **(3) Nolo Contendere Plea.** Before accepting a plea of nolo contendere, the court must consider the parties' views and the public interest in the effective administration of justice.

  **(4) Failure to Enter a Plea.** If a defendant refuses to enter a plea or if a defendant organization fails to appear, the court must enter a plea of not guilty.

**(b) Considering and Accepting a Guilty or Nolo Contendere Plea.**

  **(1) Advising and Questioning the Defendant.** Before the court accepts a plea of guilty or nolo contendere, the defendant may be placed under oath, and the court must address the defendant personally in open court. During this address, the court must inform the defendant of, and determine that the defendant understands, the following:

    **(A)** the government's right, in a prosecution for perjury or false statement, to use against the defendant any statement that the defendant gives under oath;

    **(B)** the right to plead not guilty, or having already so pleaded, to persist in that plea;

    **(C)** the right to a jury trial;

    **(D)** the right to be represented by counsel--and if necessary have the court appoint counsel--at trial and at every other stage of the proceeding;

**(E)** the right at trial to confront and cross-examine adverse witnesses, to be protected from compelled self-incrimination, to testify and present evidence, and to compel the attendance of witnesses;

**(F)** the defendant's waiver of these trial rights if the court accepts a plea of guilty or nolo contendere;

**(G)** the nature of each charge to which the defendant is pleading;

**(H)** any maximum possible penalty, including imprisonment, fine, and term of supervised release;

**(I)** any mandatory minimum penalty;

**(J)** any applicable forfeiture;

**(K)** the court's authority to order restitution;

**(L)** the court's obligation to impose a special assessment;

**(M)** in determining a sentence, the court's obligation to calculate the applicable sentencing-guideline range and to consider that range, possible departures under the Sentencing Guidelines, and other sentencing factors under 18 U.S.C. § 3553(a);

**(N)** the terms of any plea-agreement provision waiving the right to appeal or to collaterally attack the sentence; and

**(O)** that, if convicted, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

**(2) Ensuring That a Plea Is Voluntary.** Before accepting a plea of guilty or nolo contendere, the court must address the defendant personally in open court and determine that the plea is voluntary and did not result from force, threats, or promises (other than promises in a plea agreement).

**(3) Determining the Factual Basis for a Plea.** Before entering judgment on a guilty plea, the court must determine that there is a factual basis for the plea.

**(c) Plea Agreement Procedure.**

**(1) In General.** An attorney for the government and the defendant's attorney, or the defendant when proceeding pro se, may discuss and reach a plea agreement. The court must not participate in these discussions. If the defendant pleads

Case 14-4133, Document 61, 08/24/2016, 1848596, Page114 of 133

guilty or nolo contendere to either a charged offense or a lesser or related offense, the plea agreement may specify that an attorney for the government will:

**(A)** not bring, or will move to dismiss, other charges;

**(B)** recommend, or agree not to oppose the defendant's request, that a particular sentence or sentencing range is appropriate or that a particular provision of the Sentencing Guidelines, or policy statement, or sentencing factor does or does not apply (such a recommendation or request does not bind the court); or

**(C)** agree that a specific sentence or sentencing range is the appropriate disposition of the case, or that a particular provision of the Sentencing Guidelines, or policy statement, or sentencing factor does or does not apply (such a recommendation or request binds the court once the court accepts the plea agreement).

**(2) Disclosing a Plea Agreement.** The parties must disclose the plea agreement in open court when the plea is offered, unless the court for good cause allows the parties to disclose the plea agreement in camera.

**(3) Judicial Consideration of a Plea Agreement.**

**(A)** To the extent the plea agreement is of the type specified in Rule 11(c)(1)(A) or (C), the court may accept the agreement, reject it, or defer a decision until the court has reviewed the presentence report.

**(B)** To the extent the plea agreement is of the type specified in Rule 11(c)(1)(B), the court must advise the defendant that the defendant has no right to withdraw the plea if the court does not follow the recommendation or request.

**(4) Accepting a Plea Agreement.** If the court accepts the plea agreement, it must inform the defendant that to the extent the plea agreement is of the type specified in Rule 11(c)(1)(A) or (C), the agreed disposition will be included in the judgment.

**(5) Rejecting a Plea Agreement.** If the court rejects a plea agreement containing provisions of the type specified in Rule 11(c)(1)(A) or (C), the court must do the following on the record and in open court (or, for good cause, in camera):

**(A)** inform the parties that the court rejects the plea agreement;

**(B)** advise the defendant personally that the court is not required to follow the plea agreement and give the defendant an opportunity to withdraw the plea; and

**(C)** advise the defendant personally that if the plea is not withdrawn, the court may dispose of the case less favorably toward the defendant than the plea agreement contemplated.

**(d) Withdrawing a Guilty or Nolo Contendere Plea.** A defendant may withdraw a plea of guilty or nolo contendere:

**(1)** before the court accepts the plea, for any reason or no reason; or

**(2)** after the court accepts the plea, but before it imposes sentence if:

**(A)** the court rejects a plea agreement under Rule 11(c)(5); or

**(B)** the defendant can show a fair and just reason for requesting the withdrawal.

**(e) Finality of a Guilty or Nolo Contendere Plea.** After the court imposes sentence, the defendant may not withdraw a plea of guilty or nolo contendere, and the plea may be set aside only on direct appeal or collateral attack.

**(f) Admissibility or Inadmissibility of a Plea, Plea Discussions, and Related Statements.** The admissibility or inadmissibility of a plea, a plea discussion, and any related statement is governed by Federal Rule of Evidence 410.

**(g) Recording the Proceedings.** The proceedings during which the defendant enters a plea must be recorded by a court reporter or by a suitable recording device. If there is a guilty plea or a nolo contendere plea, the record must include the inquiries and advice to the defendant required under Rule 11(b) and (c).

**(h) Harmless Error.** A variance from the requirements of this rule is harmless error if it does not affect substantial rights.

CREDIT(S)

   (As amended Feb. 28, 1966, eff. July 1, 1966; Apr. 22, 1974, eff. Dec. 1, 1975; July 31, 1975, Pub.L. 94-64, § 3(5)-(10), 89 Stat. 371, 372; Apr. 30, 1979, eff. Aug. 1, 1979, and Dec. 1, 1980; Apr. 28, 1982, eff. Aug. 1, 1982; Apr. 28, 1983, eff. Aug. 1, 1983; Apr. 29, 1985, eff. Aug. 1, 1985; Mar. 9, 1987, eff. Aug. 1, 1987; Nov. 18, 1988, Pub.L. 100-690, Title VII, § 7076, 102 Stat. 4406; Apr. 25, 1989, eff. Dec. 1, 1989; Apr. 29, 1999, eff. Dec. 1, 1999; Apr. 29, 2002, eff. Dec. 1, 2002; Apr. 30, 2007, eff. Dec. 1, 2007; Apr. 16, 2013, eff. Dec. 1, 2013.)

Fed. Rules Cr. Proc. Rule 11, 18 U.S.C.A., FRCRP Rule 11
Including Amendments Received Through 8-1-16

End of Document                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

McKinney's Consolidated Laws of New York Annotated
    Penal Law (Refs & Annos)
        Chapter 40. Of the Consolidated Laws (Refs & Annos)
           Part Three. Specific Offenses
               Title H. Offenses Against the Person Involving Physical Injury, Sexual Conduct, Restraint and Intimidation
                   Article 125. Homicide, Abortion and Related Offenses (Refs & Annos)

McKinney's Penal Law § 125.25

§ 125.25 Murder in the second degree

Effective: November 1, 2006
Currentness

A person is guilty of murder in the second degree when:

1. With intent to cause the death of another person, he causes the death of such person or of a third person; except that in any prosecution under this subdivision, it is an affirmative defense that:

(a) The defendant acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be. Nothing contained in this paragraph shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime; or

(b) The defendant's conduct consisted of causing or aiding, without the use of duress or deception, another person to commit suicide. Nothing contained in this paragraph shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the second degree or any other crime; or

2. Under circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person; or

3. Acting either alone or with one or more other persons, he commits or attempts to commit robbery, burglary, kidnapping, arson, rape in the first degree, criminal sexual act in the first degree, sexual abuse in the first degree, aggravated sexual abuse, escape in the first degree, or escape in the second degree, and, in the course of and in furtherance of such crime or of immediate flight therefrom, he, or another participant, if there be any, causes the death of a person other than one of the participants; except that in any prosecution under this subdivision, in which the defendant was not the only participant in the underlying crime, it is an affirmative defense that the defendant:

(a) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Case 14-4133, Document 61, 08/24/2016, 1848596, Page117 of 133

(b) Was not armed with a deadly weapon, or any instrument, article or substance readily capable of causing death or serious physical injury and of a sort not ordinarily carried in public places by law-abiding persons; and

(c) Had no reasonable ground to believe that any other participant was armed with such a weapon, instrument, article or substance; and

(d) Had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury; or

4. Under circumstances evincing a depraved indifference to human life, and being eighteen years old or more the defendant recklessly engages in conduct which creates a grave risk of serious physical injury or death to another person less than eleven years old and thereby causes the death of such person; or

5. Being eighteen years old or more, while in the course of committing rape in the first, second or third degree, criminal sexual act in the first, second or third degree, sexual abuse in the first degree, aggravated sexual abuse in the first, second, third or fourth degree, or incest in the first, second or third degree, against a person less than fourteen years old, he or she intentionally causes the death of such person.

Murder in the second degree is a class A-I felony.

**Credits**
(L.1965, c. 1030. Amended L.1967, c. 791, § 9; L.1973, c. 276, § 13; L.1974, c. 367, § 4; L.1984, c. 210, § 1; L.1990, c. 477, § 4; L.2003, c. 264, § 10, eff. Nov. 1, 2003; L.2004, c. 459, § 4, eff. Nov. 1, 2004; L.2006, c. 320, § 7, eff. Nov. 1, 2006.)

McKinney's Penal Law § 125.25, NY PENAL § 125.25
Current through L.2016, chapters 1 to 240.

    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

    © 2016 Thomson Reuters. No claim to original U.S. Government Works.       2

Case 14-4133, Document 61, 08/24/2016, 1848596, Page118 of 133

McKinney's Consolidated Laws of New York Annotated
    Penal Law (Refs & Annos)
        Chapter 40. Of the Consolidated Laws (Refs & Annos)
            Part Three. Specific Offenses
                Title M. Offenses Against Public Health and Morals
                    Article 225. Gambling Offenses (Refs & Annos)

McKinney's Penal Law § 225.00

§ 225.00 Gambling offenses; definitions of terms

Effective: May 13, 2015

Currentness

The following definitions are applicable to this article:

1. "Contest of chance" means any contest, game, gaming scheme or gaming device in which the outcome depends in a material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor therein.

2. "Gambling." A person engages in gambling when he stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome.

3. "Player" means a person who engages in any form of gambling solely as a contestant or bettor, without receiving or becoming entitled to receive any profit therefrom other than personal gambling winnings, and without otherwise rendering any material assistance to the establishment, conduct or operation of the particular gambling activity. A person who gambles at a social game of chance on equal terms with the other participants therein does not otherwise render material assistance to the establishment, conduct or operation thereof by performing, without fee or remuneration, acts directed toward the arrangement or facilitation of the game, such as inviting persons to play, permitting the use of premises therefor and supplying cards or other equipment used therein. A person who engages in "bookmaking", as defined in this section is not a "player."

4. "Advance gambling activity." A person "advances gambling activity" when, acting other than as a player, he engages in conduct which materially aids any form of gambling activity. Such conduct includes but is not limited to conduct directed toward the creation or establishment of the particular game, contest, scheme, device or activity involved, toward the acquisition or maintenance of premises, paraphernalia, equipment or apparatus therefor, toward the solicitation or inducement of persons to participate therein, toward the actual conduct of the playing phases thereof, toward the arrangement of any of its financial or recording phases, or toward any other phase of its operation. One advances gambling activity when, having substantial proprietary or other authoritative control over premises being used with his knowledge for purposes of gambling activity, he permits such to occur or continue or makes no effort to prevent its occurrence or continuation.

Case 14-4133, Document 61, 08/24/2016, 1848596, Page119 of 133

5. "Profit from gambling activity." A person "profits from gambling activity" when, other than as a player, he accepts or receives money or other property pursuant to an agreement or understanding with any person whereby he participates or is to participate in the proceeds of gambling activity.

6. "Something of value" means any money or property, any token, object or article exchangeable for money or property, or any form of credit or promise directly or indirectly contemplating transfer of money or property or of any interest therein, or involving extension of a service, entertainment or a privilege of playing at a game or scheme without charge.

7. "Gambling device" means any device, machine, paraphernalia or equipment which is used or usable in the playing phases of any gambling activity, whether such activity consists of gambling between persons or gambling by a person involving the playing of a machine. Notwithstanding the foregoing, lottery tickets, policy slips and other items used in the playing phases of lottery and policy schemes are not gambling devices.

7-a. A "coin operated gambling device" means a gambling device which operates as a result of the insertion of something of value. A device designed, constructed or readily adaptable or convertible for such use is a coin operated gambling device notwithstanding the fact that it may require adjustment, manipulation or repair in order to operate as such. A machine which awards free or extended play is not a gambling device merely because such free or extended play may constitute something of value provided that the outcome depends upon the skill of the player and not in a material degree upon an element of chance.

8. "Slot machine" means a gambling device which, as a result of the insertion of a coin or other object, operates, either completely automatically or with the aid of some physical act by the player, in such manner that, depending upon elements of chance, it may eject something of value. A device so constructed, or readily adaptable or convertible to such use, is no less a slot machine because it is not in working order or because some mechanical act of manipulation or repair is required to accomplish its adaptation, conversion or workability. Nor is it any less a slot machine because, apart from its use or adaptability as such, it may also sell or deliver something of value on a basis other than chance. A machine which sells items of merchandise which are of equivalent value, is not a slot machine merely because such items differ from each other in composition, size, shape or color.

9. "Bookmaking" means advancing gambling activity by unlawfully accepting bets from members of the public as a business, rather than in a casual or personal fashion, upon the outcomes of future contingent events.

10. "Lottery" means an unlawful gambling scheme in which (a) the players pay or agree to pay something of value for chances, represented and differentiated by numbers or by combinations of numbers or by some other media, one or more of which chances are to be designated the winning ones; and (b) the winning chances are to be determined by a drawing or by some other method based upon the element of chance; and (c) the holders of the winning chances are to receive something of value provided, however, that in no event shall the provisions of this subdivision be construed to include a raffle as such term is defined in subdivision three-b of section one hundred eighty-six of the general municipal law.

11. "Policy" or "the numbers game" means a form of lottery in which the winning chances or plays are not determined upon the basis of a drawing or other act on the part of persons conducting or connected with the scheme, but upon the basis of the outcome or outcomes of a future contingent event or events otherwise unrelated to the particular scheme.

Case 14-4133, Document 61, 08/24/2016, 1848596, Page120 of 133

12. "Unlawful" means not specifically authorized by law.

13. "Authorized gaming establishment" means any structure, structure and adjacent or attached structure, or grounds adjacent to a structure in which casino gaming, conducted pursuant to article thirteen of the racing, pari-mutuel wagering and breeding law, or Class III gaming, as authorized pursuant to a compact reached between the state of New York and a federally recognized Indian nation or tribe under the federal Indian Gaming Regulatory Act of 1988, is conducted and shall include all public and non-public areas of any such building, except for such areas of a building where either Class I or II gaming are conducted or any building or grounds known as a video gaming entertainment facility, including facilities where food and drink are served, as well as those areas not normally open to the public, such as where records related to video lottery gaming operations are kept, except shall not include the racetracks or such areas where such video lottery gaming operations or facilities do not take place or exist, such as racetrack areas or fairgrounds which are wholly unrelated to video lottery gaming operations, pursuant to section sixteen hundred seventeen-a and paragraph five of subdivision a of section sixteen hundred twelve of the tax law, as amended and implemented.

14. "Authorized gaming operator" means an enterprise or business entity authorized by state or federal law to operate casino or video lottery gaming.

15. "Casino gaming" means games authorized to be played pursuant to a license granted under article thirteen of the racing, pari-mutuel wagering and breeding law or by federally recognized Indian nations or tribes pursuant to a valid gaming compact reached in accordance with the federal Indian Gaming Regulatory Act of 1988, Pub. L. 100-497, 102 Stat. 2467, codified at 25 U.S.C. §§ 2701-21 and 18 U.S.C. §§ 1166-68.

16. "Cash equivalent" means a treasury check, a travelers check, wire transfer of funds, transfer check, money order, certified check, cashiers check, payroll check, a check drawn on the account of the authorized gaming operator payable to the patron or to the authorized gaming establishment, a promotional coupon, promotional chip, promotional cheque, promotional token, or a voucher recording cash drawn against a credit card or charge card.

17. "Cheques" or "chips" or "tokens" means nonmetal, metal or partly metal representatives of value, redeemable for cash or cash equivalent, and issued and sold by an authorized casino operator for use at an authorized gaming establishment. The value of such cheques or chips or tokens shall be considered equivalent in value to the cash or cash equivalent exchanged for such cheques or chips or tokens upon purchase or redemption.

18. "Class I gaming" and "Class II gaming" means those forms of gaming that are not Class III gaming, as defined in subsection eight of section four of the federal Indian Gaming Regulatory Act, 25 U.S.C. § 2703.

19. "Class III gaming" means those forms of gaming that are not Class I or Class II gaming, as defined in subsections six and seven of section four of the federal Indian Gaming Regulatory Act, 25 U.S.C. § 2703 and those games enumerated in the Appendix of a gaming compact.

20. "Compact" or "gaming compact" means the agreement between a federally recognized Indian tribe and the state of New York regarding Class III gaming activities entered into pursuant to the federal Indian Gaming Regulatory Act, Pub. L. 100-497, 102 Stat. 2467, codified at 25 U.S.C. §§ 2701-21 and 18 U.S.C. §§ 1166-68 (1988 & Supp. II).

Case 14-4133, Document 61, 08/24/2016, 1848596, Page121 of 133

21. "Gaming equipment or device" means any machine or device which is specially designed or manufactured for use in the operation of any Class III or video lottery game.

22. "Gaming regulatory authority" means, with respect to any authorized gaming establishment on Indian lands, territory or reservation, the Indian nation or tribal gaming commission, its authorized officers, agents and representatives acting in their official capacities or such other agency of a nation or tribe as the nation or tribe may designate as the agency responsible for the regulation of Class III gaming, jointly with the state gaming agency, conducted pursuant to a gaming compact between the nation or tribe and the state of New York, or with respect to any casino gaming authorized pursuant to article thirteen of the racing, pari-mutuel wagering and breeding law or video lottery gaming conducted pursuant to section sixteen hundred seventeen-a and paragraph five of subdivision a of section sixteen hundred twelve of the tax law, as amended and implemented.

23. "Premises" includes any structure, parking lot, building, vehicle, watercraft, and any real property.

24. "Sell" means to sell, exchange, give or dispose of to another.

25. "State gaming agency" shall mean the New York state gaming commission, its authorized officials, agents, and representatives acting in their official capacities as the regulatory agency of the state which has responsibility for regulation with respect to video lottery gaming or casino gaming.

26. "Unfair gaming equipment" means loaded dice, marked cards, substituted cards or dice, or fixed roulette wheels or other gaming equipment which has been altered in a way that tends to deceive or tends to alter the elements of chance or normal random selection which determine the result of the game or outcome, or the amount or frequency of the payment in a game.

27. "Unlawful gaming property" means:

(a) any device, not prescribed for use in casinio [1] gaming by its rules, which is capable of assisting a player:

(i) to calculate any probabilities material to the outcome of a contest of chance; or

(ii) to receive or transmit information material to the outcome of a contest of chance; or

(b) any object or article which, by virtue of its size, shape or any other quality, is capable of being used in casino gaming as an improper substitute for a genuine chip, cheque, token, betting coupon, debit instrument, voucher or other instrument or indicia of value; or

(c) any unfair gaming equipment.

28. "Video lottery gaming" has the meaning set forth in subdivision six of section sixteen hundred two of the tax law.

Case 14-4133, Document 61, 09/24/2016, 1848596, Page122 of 133

29. "Voucher" means an instrument of value generated by a video lottery terminal representing a monetary amount and/or play value owed to a customer at a specific video lottery terminal based on video lottery gaming winnings and/or amounts not wagered.

**Credits**

(L.1965, c. 1030. Amended L.1967, c. 791, § 31; L.1987, c. 632, §§ 1, 2; L.1994, c. 550, § 1; L.2011, c. 8, § 1, eff. March 25, 2011; L.2013, c. 174, § 3, eff. July 30, 2013; L.2013, c. 175, § 3, eff. July 30, 2013; L.2015, c. 59, pt. OO, § 2, eff. May 13, 2015.)

Footnotes

1          So in original ("casinio" should be "casino").

McKinney's Penal Law § 225.00, NY PENAL § 225.00

Current through L.2016, chapters 1 to 240.

---

**End of Document**                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

---

McKinney's Consolidated Laws of New York Annotated
  Penal Law (Refs & Annos)
    Chapter 40. Of the Consolidated Laws (Refs & Annos)
      Part Three. Specific Offenses
        Title M. Offenses Against Public Health and Morals
          Article 225. Gambling Offenses (Refs & Annos)

McKinney's Penal Law § 225.05

§ 225.05 Promoting gambling in the second degree

Currentness

A person is guilty of promoting gambling in the second degree when he knowingly advances or profits from unlawful gambling activity.

Promoting gambling in the second degree is a class A misdemeanor.

**Credits**
(L.1965, c. 1030.)

McKinney's Penal Law § 225.05, NY PENAL § 225.05
Current through L.2016, chapters 1 to 240.

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

---

United States Code Annotated
    Federal Sentencing Guidelines (Refs & Annos)
        Chapter Two. Offense Conduct (Refs & Annos)
            Part A. Offenses Against the Person
                1. Homicide

USSG, § 2A1.1, 18 U.S.C.A.

§ 2A1.1. First Degree Murder

Currentness

**(a)** Base Offense Level: 43

<[Commentary to Guideline is located in Historical Note field. The following credit reflects amendments to both Guideline and Commentary.]>

**CREDIT(S)**

  (Effective November 1, 1987; amended effective November 1, 1989; November 1, 1990; November 1, 1993; November 1, 2002; November 1, 2004; November 1, 2006; November 1, 2007; November 1, 2010.)

**COMMENTARY**

<**Statutory Provisions:** 18 U.S.C. §§ 1111, 1841(a)(2)(C), 1992(a)(7), 2113(e), 2118(c)(2), 2199, 2282A, 2291, 2332b(a)(1), 2340A; 21 U.S.C. § 848(e). For additional statutory provision(s), see Appendix A (Statutory Index).>

<**Application Notes:**>

<**1. Applicability of Guideline.--**This guideline applies in cases of premeditated killing. This guideline also applies when death results from the commission of certain felonies. For example, this guideline may be applied as a result of a cross reference (e.g., a kidnapping in which death occurs, **see** § 2A4.1(c)(1)), or in cases in which the offense level of a guideline is calculated using the underlying crime (e.g., murder in aid of racketeering, **see** § 2E1.3(a)(2)).>

<**2. Imposition of Life Sentence.--**>

  <**(A) Offenses Involving Premeditated Killing.--**In the case of premeditated killing, life imprisonment is the appropriate sentence if a sentence of death is not imposed. A downward departure would not be appropriate in such a case. A downward departure from a mandatory statutory term of life imprisonment is permissible only in cases in which the government files a motion for a downward departure for the defendant's substantial assistance, as provided in 18 U.S.C. 3553(e).>

  <**(B) Felony Murder.--**If the defendant did not cause the death intentionally or knowingly, a downward departure may be warranted. For example, a downward departure may be warranted if in robbing a bank, the defendant merely passed a note to the teller, as a result of which the teller had a heart attack and died. The extent of the departure should be based upon the defendant's state of mind (e.g., recklessness or negligence), the degree of risk inherent in the conduct, and the nature of the underlying offense conduct. However, departure below the minimum guideline sentence provided for second degree murder in § 2A1.2 (Second

Case 14-4133, Document 61, 08/24/2016, 1848596, Page125 of 133

Degree Murder) is not likely to be appropriate. Also, because death obviously is an aggravating factor, it necessarily would be inappropriate to impose a sentence at a level below that which the guideline for the underlying offense requires in the absence of death.>

<**3. Applicability of Guideline When Death Sentence Not Imposed.--**If the defendant is sentenced pursuant to 18 U.S.C. 3591 et seq. or 21 U.S.C. § 848(e), a sentence of death may be imposed under the specific provisions contained in that statute. This guideline applies when a sentence of death is not imposed under those specific provisions.>

Notes of Decisions (50)

Federal Sentencing Guidelines, § 2A1.1, 18 U.S.C.A., FSG § 2A1.1
As amended to 7-13-16

---

**End of Document**      © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Case 14-4133, Document 61, 08/24/2016, 1848596, Page126 of 133

United States Code Annotated
   Federal Sentencing Guidelines (Refs & Annos)
      Chapter Two. Offense Conduct (Refs & Annos)
         Part A. Offenses Against the Person
            1. Homicide

USSG, § 2A1.2, 18 U.S.C.A.

§ 2A1.2. Second Degree Murder

Currentness

**(a)** Base Offense Level: 38

<[Commentary to Guideline is located in Historical Note field. The following credit reflects amendments to both Guideline and Commentary.]>

**CREDIT(S)**
(Effective November 1, 1987; amended November 1, 2002; November 1, 2004; November 1, 2006; November 1, 2007.)

**COMMENTARY**

<***Statutory Provisions:*** *18 U.S.C. §§ 1111, 1841(a)(2)(C), 2199, 2282A, 2291, 2332b(a)(1), 2340A. For additional statutory provision(s), see Appendix A (Statutory Index).*>

<**Application Note:**>

<**1. Upward Departure Provision.--**If the defendant's conduct was exceptionally heinous, cruel, brutal, or degrading to the victim, an upward departure may be warranted. See § 5K2.8 (Extreme Conduct).>

Notes of Decisions (7)

Federal Sentencing Guidelines, § 2A1.2, 18 U.S.C.A., FSG § 2A1.2
As amended to 7-13-16

End of Document      © 2016 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Federal Sentencing Guidelines (Refs & Annos)
    Chapter Two. Offense Conduct (Refs & Annos)
      Part B. Basic Economic Offenses
        3. Robbery, Extortion, and Blackmail

USSG, § 2B3.2, 18 U.S.C.A.

§ 2B3.2. Extortion by Force or Threat of Injury or Serious Damage

Currentness

**(a)** Base Offense Level: 18

**(b)** Specific Offense Characteristics

**(1)** If the offense involved an express or implied threat of death, bodily injury, or kidnapping, increase by 2 levels.

**(2)** If the greater of the amount demanded or the loss to the victim exceeded $20,000, increase by the corresponding number of levels from the table in § 2B3.1(b)(7).

**(3)(A)** (i) If a firearm was discharged, increase by 7 levels; (ii) if a firearm was otherwise used, increase by 6 levels; (iii) if a firearm was brandished or possessed, increase by 5 levels; (iv) if a dangerous weapon was otherwise used, increase by 4 levels; or (v) if a dangerous weapon was brandished or possessed, increase by 3 levels; or

**(B)** If (i) the offense involved preparation to carry out a threat of (I) death; (II) serious bodily injury; (III) kidnapping; (IV) product tampering; or (V) damage to a computer system used to maintain or operate a critical infrastructure, or by or for a government entity in furtherance of the administration of justice, national defense, or national security; or (ii) the participant(s) otherwise demonstrated the ability to carry out a threat described in any of subdivisions (i)(I) through (i)(V), increase by 3 levels.

**(4)** If any victim sustained bodily injury, increase the offense level according to the seriousness of the injury:

|  | Degree of Bodily Injury | Increase in Level |
|---|---|---|
| **(A)** | Bodily Injury | add 2 |
| **(B)** | Serious Bodily Injury | add 4 |
| **(C)** | Permanent or Life-Threatening Bodily Injury | add 6 |
| **(D)** | If the degree of injury is between that specified in subdivisions (A) and (B), add 3 levels; or |  |

**(E)** If the degree of injury is between that specified in subdivisions (B) and (C), add 5 levels.

*Provided,* however, that the cumulative adjustments from (3) and (4) shall not exceed 11 levels.

**(5)** (A) If any person was abducted to facilitate commission of the offense or to facilitate escape, increase by 4 levels; or (B) if any person was physically restrained to facilitate commission of the offense or to facilitate escape, increase by 2 levels.

**(c)** Cross References

(1) If a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States, apply § 2A1.1 (First Degree Murder).

(2) If the offense was tantamount to attempted murder, apply § 2A2.1 (Assault with Intent to Commit Murder; Attempted Murder) if the resulting offense level is greater than that determined above.

<[Commentary to Guideline is located in Historical Note field. The following credit reflects amendments to both Guideline and Commentary.]>

**CREDIT(S)**

(Effective November 1, 1987; amended effective November 1, 1989; November 1, 1990; November 1, 1991; November 1, 1993; November 1, 1997; November 1, 1998; November 1, 2000; November 1, 2003; November 1, 2015.)

**COMMENTARY**

<***Statutory Provisions:*** *18 U.S.C. §§ 875(b), 876, 877, 1030(a)(7), 1951. For additional statutory provision(s), see Appendix A (Statutory Index).*>

<***Application Notes:***>

<**1. Definitions.**--For purposes of this guideline:>

<"Abducted," "bodily injury," "brandished," "dangerous weapon," "firearm," "otherwise used," "permanent or life-threatening bodily injury," "physically restrained," and "serious bodily injury" have the meaning given those terms in Application Note 1 of the Commentary to § 1B1.1 (Application Instructions).>

<"Critical infrastructure" means systems and assets vital to national defense, national security, economic security, public health or safety, or any combination of those matters. A critical infrastructure may be publicly or privately owned. Examples of critical infrastructures include gas and oil production, storage, and delivery systems, water supply systems, telecommunications networks, electrical power delivery systems, financing and banking systems, emergency services (including medical, police, fire, and rescue services), transportation systems and services (including highways, mass transit, airlines, and airports), and government operations that provide essential services to the public.>

<"Government entity" has the meaning given that term in 18 U.S.C. 1030(e)(9).>

<**2.** This guideline applies if there was any threat, express or implied, that reasonably could be interpreted as one to injure a person or physically damage property, or any comparably serious threat, such as to drive an enterprise out of business. Even if the threat does not in itself imply violence, the possibility of violence or serious adverse consequences may be inferred from the circumstances of the threat or the reputation of the person making it. An ambiguous threat, such as "pay up or else," or a threat to cause labor problems, ordinarily should be treated under this section.>

<**3.** Guidelines for bribery involving public officials are found in Part C, Offenses Involving Public Officials. "Extortion under color of official right," which usually is solicitation of a bribe by a public official, is covered under § 2C1.1 unless there is use of force or a threat that qualifies for treatment under this section. Certain other extortion offenses are covered under the provisions of Part E, Offenses Involving Criminal Enterprises and Racketeering.>

<**4.** The combined adjustments for weapon involvement and injury are limited to a maximum enhancement of 11 levels.>

<**5.** "Loss to the victim," as used in subsection (b)(2), means any demand paid plus any additional consequential loss from the offense (e.g., the cost of defensive measures taken in direct response to the offense).>

<**6.** In certain cases, an extortionate demand may be accompanied by conduct that does not qualify as a display of a dangerous weapon under subsection (b)(3)(A)(v) but is nonetheless similar in seriousness, demonstrating the defendant's preparation or ability to carry out the threatened harm (e.g., an extortionate demand containing a threat to tamper with a consumer product accompanied by a workable plan showing how the product's tamper-resistant seals could be defeated, or a threat to kidnap a person accompanied by information showing study of that person's daily routine). Subsection (b)(3)(B) addresses such cases.>

<**7.** If the offense involved the threat of death or serious bodily injury to numerous victims (e.g., in the case of a plan to derail a passenger train or poison consumer products), an upward departure may be warranted.>

<**8.** If the offense involved organized criminal activity, or a threat to a family member of the victim, an upward departure may be warranted.>

<*Background: The Hobbs Act, 18 U.S.C. § 1951, prohibits extortion, attempted extortion, and conspiracy to extort. It provides for a maximum term of imprisonment of twenty years. 18 U.S.C. §§ 875-877 prohibits communication of extortionate demands through various means. The maximum penalty under these statutes varies from two to twenty years. Violations of 18 U.S.C. § 875 involve threats or demands transmitted by interstate commerce. Violations of 18 U.S.C. § 876 involve the use of the United States mails to communicate threats, while violations of § 877 involve mailing threatening communications from foreign countries. This guideline also applies to offenses under 18 U.S.C. § 1030(a)(7) involving a threat to impair the operation of a "protected computer".>*

Notes of Decisions (33)

Federal Sentencing Guidelines, § 2B3.2, 18 U.S.C.A., FSG § 2B3.2
As amended to 7-13-16

WESTLAW  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

§ 2E1.1. Unlawful Conduct Relating to Racketeer Influenced and..., FSG § 2E1.1.

Case 14-4133, Document 61, 08/24/2016, 1848596, Page130 of 133

United States Code Annotated
    Federal Sentencing Guidelines (Refs & Annos)
        Chapter Two. Offense Conduct (Refs & Annos)
            Part E. Offenses Involving Criminal Enterprises and Racketeering
                1. Racketeering (Refs & Annos)

USSG, § 2E1.1, 18 U.S.C.A.

§ 2E1.1. Unlawful Conduct Relating to Racketeer Influenced and Corrupt Organizations

Currentness

**(a)** Base Offense Level (Apply the greater):

**(1)** 19; or

**(2)** the offense level applicable to the underlying racketeering activity.

<[Commentary to Guideline is located in Historical Note field. The following credit reflects amendments to both Guideline and Commentary.]>

**CREDIT(S)**
(Effective November 1, 1987; amended effective June 15, 1988; November 1, 1989.)

**COMMENTARY**

<***Statutory Provisions:*** *18 U.S.C. §§ 1962, 1963.*>

<***Application Notes:***>

<**1.** Where there is more than one underlying offense, treat each underlying offense as if contained in a separate count of conviction for the purposes of subsection (a)(2). To determine whether subsection (a)(1) or (a)(2) results in the greater offense level, apply Chapter Three, Parts A, B, C, and D to both (a)(1) and (a)(2). Use whichever subsection results in the greater offense level.>

<**2.** If the underlying conduct violates state law, the offense level corresponding to the most analogous federal offense is to be used.>

<**3.** If the offense level for the underlying racketeering activity is less than the alternative minimum level specified (i.e., 19), the alternative minimum base offense level is to be used.>

<**4.** Certain conduct may be charged in the count of conviction as part of a "pattern of racketeering activity" even though the defendant has previously been sentenced for that conduct. Where such previously imposed sentence resulted from a conviction prior to the last overt act of the instant offense, treat as a prior sentence under § 4A1.2(a)(1) and not as part of the instant offense. This treatment is designed to produce a result

Case 14-4133, Document 61, 08/24/2016, 1848596, Page131 of 133

consistent with the distinction between the instant offense and criminal history found throughout the guidelines. If this treatment produces an anomalous result in a particular case, a guideline departure may be warranted.>

Notes of Decisions (31)

Federal Sentencing Guidelines, § 2E1.1, 18 U.S.C.A., FSG § 2E1.1
As amended to 7-13-16

---

**End of Document**      © 2016 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
   Federal Sentencing Guidelines (Refs & Annos)
     Chapter Three. Adjustments (Refs & Annos)
       Part B. Role in the Offense (Refs & Annos)

USSG, § 3B1.1, 18 U.S.C.A.

§ 3B1.1. Aggravating Role

Currentness

Based on the defendant's role in the offense, increase the offense level as follows:

**(a)** If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

**(b)** If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

**(c)** If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

<[Commentary to Guideline is located in Historical Note field. The following credit reflects amendments to both Guideline and Commentary.]>

**CREDIT(S)**
(Effective November 1, 1987; amended effective November 1, 1991; November 1, 1993.)

**COMMENTARY**

*<Application Notes:>*

<**1.** A "participant" is a person who is criminally responsible for the commission of the offense, but need not have been convicted. A person who is not criminally responsible for the commission of the offense (e.g., an undercover law enforcement officer) is not a participant.>

<**2.** To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants. An upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization.>

<**3.** In assessing whether an organization is "otherwise extensive," all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive.>

Case 14-4133, Document 61, 08/24/2016, 1848596, Page133 of 133

**<4.** In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This adjustment does not apply to a defendant who merely suggests committing the offense.>

*<**Background:** This section provides a range of adjustments to increase the offense level based upon the size of a criminal organization (i.e., the number of participants in the offense) and the degree to which the defendant was responsible for committing the offense. This adjustment is included primarily because of concerns about relative responsibility. However, it is also likely that persons who exercise a supervisory or managerial role in the commission of an offense tend to profit more from it and present a greater danger to the public and\or are more likely to recidivate. The Commission's intent is that this adjustment should increase with both the size of the organization and the degree of the defendant's responsibility.>*

<In relatively small criminal enterprises that are not otherwise to be considered as extensive in scope or in planning or preparation, the distinction between organization and leadership, and that of management or supervision, is of less significance than in larger enterprises that tend to have clearly delineated divisions of responsibility. This is reflected in the inclusiveness of § 3B1.1(c).>

Notes of Decisions (1073)

Federal Sentencing Guidelines, § 3B1.1, 18 U.S.C.A., FSG § 3B1.1
As amended to 7-13-16

---

**End of Document**                               © 2016 Thomson Reuters. No claim to original U.S. Government Works.